**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. 21-cr-00198 (TSC)** |
| **TROY ANTHONY SMOCKS,** | |
| **Defendant.** | |

**MEMORANDUM IN OPPOSITION TO MOTION TO DISMISS**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in opposition to Defendant Troy Anthony Smocks' Amended Motion to Dismiss (Dkt No. 19).

**BACKGROUND**

***The Complaint***

The defendant was charged in a sealed criminal complaint on January 14, 2021, with a violation of 18 U.S.C. § 875(c) (threats in interstate commerce) (Dkt No. 1). The affidavit in support of criminal complaint alleged that the defendant travelled from Texas to the Washington, D.C., area on January 5, 2021, the day before the January 6 rioting at the U.S. Capitol (Dkt No. 1-1 at 2). Using a social media account falsely purporting to identify him as a retired military officer, the defendant posted threatening messages on both January 6 and January 7 (*id*. at 3).[1] The social media posts are attached as Exhibit A. The January 6 message threatened law enforcement officers, including the following language:

[1] Information obtained from the social media service indicates that the two posts at issue may have been both created on January 6, 2021, and the United States will continue to investigate the matter.

> Many of Us will return [to Washington] on January 19, 2021, carrying Our weapons, in support of Our nation's resolve, to which the world will never forget!!! We will come in numbers that no standing army or policy agency can match. However, the police are NOT our enemy, unless they choose to be! All who will not stand with the American Patriots . . . or cannot stand with Us . . . then, that would be a good time for YOU to take a few vacation days.

(*Id*. at 3; Exhibit A at 1.) The defendant's January 7, 2021, social media posting threatened politicians and technology industry executives, including the following language:

> So over the next 24 hours, I would say, lets get our personal affairs in order. Prepare Our weapons, and then go get 'em. Lets hunt these cowards down like the Traitors that each of them are. This includes RINOs, Dems, and Tech Execs. We now have the green light. [All] who resist Us are enemies of Our Constitution, and must be treated as such. Today, the cowards ran as We took the Capital. They have it back now, only because We left. It wasn't the building that We wanted . . . it was them!

(Dkt No. 1-1 at 3; Exhibit A at 2.)

The affidavit, which laid out all the essential elements of the crime charged, alleged that the defendant's social media posts were viewed by other users tens of thousands of times (Dkt No. 1-1 at 3).

***The Proceedings in Texas***

The defendant was arrested in the Eastern District of Texas on the morning of January 15, 2021. The government moved for pretrial detention at a Rule 5 initial appearance hearing later that day (Case No. 21-mj-00033, E. D. Tex., Minute Entry January 15, 2021 and Dkt No. 2) (attached as Exhibit B). The Magistrate Judge in the Eastern District of Texas scheduled a combined preliminary hearing and detention hearing for January 21, 2021, and ordered that the defendant be detained pending the hearing (*id*.). The defendant retained new counsel, who entered an appearance and filed a motion for substitution of counsel on January 20, 2021 (Case No. 21-

mj-00033, E. D. Tex., Dkt Nos. 7, 8) (attached as Exhibits C, D). The motion for substitution of counsel was granted that same day (Case No. 21-mj-00033, E. D. Tex., Dkt No. 9) (attached as Exhibit E).

A preliminary and detention hearing was held on January 21, 2021, lasting more than two hours with live witness testimony and the introduction of evidence by both parties (Case No. 21-mj-00033, E. D. Tex., Dkt No. 11) (attached as Exhibit F). A transcript of the hearing is attached as Exhibit G. At the outset of the hearing, the defendant agreed through counsel that he had requested to have both his preliminary and detention hearing in the Eastern District of Texas (Exhibit G at 4).

The government's witness, Federal Bureau of Investigation ("FBI") Special Agent Kendrick Chumak, testified that the FBI had received many tips from concerned citizens about threats of violence made by the defendant's social media account (Exhibit G at 7), particularly the postings discussed above (*id*. at 9-10). The FBI conducted an analysis of the social media account and gathered information sufficient to determine that the defendant was the user of the account (*id*. at 8). Agent Chumak described a social media post made by the defendant prior to the events of January 6, 2021, where the defendant (purporting to be a retired military officer), warned of civil unrest coming in late December, and urged people to prepare their weapons to help keep things safe (*id*. at 9). Agent Chumak described the two social media posts from January 6 and 7, 2021, discussed above, and stated that the first post was viewed 60,000 or more times (*id*. at 9-10). The agent also described a YouTube video posted by the defendant in 2020, where he appeared in a military-style uniform and urged other veterans to participate in armed protests (*id*. at 10).

Agent Chumak testified that the Department of Defense reported having "no record of a Troy Smocks ever serving in the United States military" (Exhibit G at 17), despite that the defendant represented himself on social media as a retired military officer, and despite that the defendant had identified himself on a recent lease application as a former lieutenant colonel in the U.S. Army (*id*. at 11).

Agent Chumak elaborated on the defendant's lengthy history of falsely impersonating other people and fraudulently representing himself as a current or former government official. The leasing office for the defendant's apartment in Texas had provided to the FBI a fraudulent government pilot certificate and a fraudulent identification card falsely stating that the defendant was an employee of NetJets, a private jet company (Exhibit G at 11). (The FBI learned from the Federal Aviation Administration that the agency had no record of the defendant ever holding any type of pilot rating (*id*. at 31)). Agent Chumak testified that when the defendant's residence in Texas was searched on January 15, 2021, law enforcement found a bag full of fraudulent documents, including government and military identifications purporting to identify the defendant as an Army officer (*id*. at 12). Law enforcement also found a printing/laminating machine in the defendant's residence (*id*.). The agent provided detailed information that the defendant had previously falsely impersonated government officials in numerous different contexts: (1) a DEA agent during execution of a search warrant, (2) a Secret Service agent during an interaction with a member of the public, (3) an FBI agent, (4) an Army Colonel, and (5) a Diplomatic Security Service agent (*id*. at 25-39).

Agent Chumak also described statements made by the defendant in a post-arrest interview on January 15, 2021. The defendant admitted that he had travelled to Washington, D.C., from

January 5-7, 2021, and that he was the user of the social media account and made the postings at issue, though he denied intending to threaten anyone (Exhibit G at 14-17, 25-28). The defendant denied intending to represent himself as a retired military officer on his social media account, and said that he had gotten the nickname "Colonel" because he was good at softball (*id*. at 17). The defendant admitted that he had impersonated other people in the past, but that he had gone to counseling for it and didn't do it anymore (*id*. at 19). The defendant also admitted that he had made the fraudulent military identification card found in his residence, as well as the false government pilot certificate and the NetJets identification (*id*. at 20, 30). The defendant maintained that he had actually served in the military in the 1980s, and that the Department of Defense had somehow lost his records (*id*. at 18). The defendant stated to law enforcement that he travelled internationally frequently, and that he has family and friends living in foreign countries (*id*. at 21-23).

Agent Chumak was cross-examined by defense counsel twice, and he stated, among other things, that the defendant admitted he had never worked at NetJets and never held a real FAA pilot license (Exhibit G at 52-53). Agent Chumak also explained that the defendant admitted to having wired money to foreign countries (*id*. at 54). As to the residence search, the agent stated on cross-examination that the FBI also recovered two knives and a stun gun from the defendant's residence (*id*. at 56). The defendant introduced two exhibits during the cross-examination, both copies of the social media posts from January 6 and 7, 2021, discussed above (*id*. at 44).

At the conclusion of the hearing, the Magistrate Judge in the Eastern District of Texas found that there was probable cause that the defendant committed the offense with which he was charged, and ordered the defendant detained pending trial (Exhibit G at 94-96). The Magistrate

Judge found that the social media posts "urged violence," and that the defendant has a "long history of impersonating law enforcement and the military, creation and use of fraudulent and false IDs, and other documents" (*id*. at 95). The Magistrate Judge also described that there were at least 10 prior instances where the defendant failed to comply with release conditions in prior criminal cases, and that there were multiple revocations of probation and supervised release (*id*.). The Magistrate Judge issued findings of fact and conclusions of law on January 31, 2021, elaborating on the determinations that there were no release conditions that could reasonably assure public safety and the defendant's appearance as required (Case No. 21-mj-00033, E. D. Tex., Dkt No. 15) (attached as Exhibit H).

Also on January 21, 2021, the Magistrate Judge issued a written order that "[t]he U.S. Marshal must transport the defendant . . . to the charging district and deliver the defendant to the United States marshal for that district, or to another officer authorized to receive the defendant" (Case No. 21-mj-00033, E. D. Tex., Dkt No. 14) (attached as Exhibit I).

***Transportation to Washington, D.C.***

The Justice Prisoner and Alien Transportation System ("JPATS") is an agency of the U.S. government managed by the U.S. Marshals Service ("USMS"), and is charged with the transportation of persons in legal custody between prisons, detention centers, and other locations. (*See* Exhibit of Kevin Wykert, attached as Exhibit J at 1). JPATS is one of the largest agencies in the world that transports prisoners from one location to another (*id*.) JPATS operates a fleet of aircraft to move prisoners over long distances; this allows the agency to ensure high security and conserve costs (*id*.).

The significant efforts made by JPATS to transport the defendant to Washington, D.C., include the following information documented in Exhibit J:

> On January 25, 2021, JPATS received a movement request to transfer Troy Anthony Smocks ("the defendant") from his then-current location, Fannin County Jail in Texas, to the Washington, D.C., area. The next day, January 26, 2021, the defendant was scheduled for a January 29, 2021, transportation from Sherman, Texas, to the Grady County Jail in Chickasha, Oklahoma.
>
> On January 29, 2021, the defendant was transferred from the Fannin County Jail, in Sherman, Texas, to the Grady County Jail in Chickasha, Oklahoma, as scheduled.
>
> JPATS's hub of aircraft operations is located in Oklahoma. Prisoners who are transferred nationally are typically held over by JPATS/USMS in one of a couple of local facilities in Oklahoma in close proximity to JPATS' hub of aircraft operations there. JPATS's other hub of aircraft operations is located in Las Vegas, Nevada, and serves the western area of the United States. During the COVID-19 pandemic, [REDACTED FROM PUBLIC FILING].
>
> During the COVID-19 pandemic, the Bureau of Prisons ("BOP") has established more restrictive movement protocols, reducing the ability of JPATS to swiftly move prisoners between locations. Capacity on aircraft and ground vehicles has been reduced due to social distancing requirements. Prisoners are also separated for transportation based on whether the movement is a BOP trip or, like the defendant's travel, a USMS trip. These public safety measures essentially cut transportation capacity in half because JPATS must fly to the same airports twice to deliver BOP and USMS prisoners separately on lighter-than-usual flights. Additionally, JPATS has adopted public health measures requiring that prisoner movements not take place within 14 days of a suspected or confirmed exposure to COVID-19. Prisoner transportation times have increased dramatically during the COVID-19 pandemic.
>
> JPATS runs two aircraft per day from Monday through Friday out of Oklahoma City, Oklahoma. [REDACTED FROM PUBLIC FILING.] The USMS does not normally meet prisoners at other locations. On occasion, the USMS will pick up prisoners bound for Washington, D.C., at an airport near Lewisburg, West Virginia, for special movements.

> The defendant was scheduled to be transported to Lewisburg, West Virginia, for a special USMS movement on February 8, 2021. Due to an administrative error, the defendant was not transported that day.
>
> The defendant was then available for a transportation on February 17, 2021, to Harrisburg, Pennsylvania (where the USMS would then complete the transportation to Washington, D.C., by motor vehicle). The flight was cancelled due to weather conditions.
>
> As indicated by open source information, a major winter and ice storm had descended on the United States in mid-February, causing blackouts, fatalities, and large amounts of snow throughout the country. Significant snow fell in Texas and Oklahoma on February 14 and 15, and rolling power outages affected millions of people across the south-central states. Record low temperatures were recorded in locations including Oklahoma City on February 16, 2021. Oklahoma entered a statewide winter weather State of Emergency beginning February 12, 2021. On February 18, 2021, the Oklahoma Department of Environmental Quality issued boil-water recommendations for parts of the state that had experienced water service outages, including Oklahoma City, lasting through February 20, 2021. The winter storm caused the cancellation of numerous JPATS flights during the week of February 15-19, 2021, causing a subsequent backlog.
>
> JPATS typically operates under a 3-10 day cycle for planning prisoner transfer flights, but this has been extended to 2-3 weeks during the challenging circumstances of the COVID-19 pandemic, to allow facilities to conduct adequate pre-departure medical testing. As a result, when a flight is cancelled, typically the schedule for the next 2-3 weeks is already made. This often causes delay of at least 2-3 weeks when a flight is cancelled.
>
> The defendant was scheduled on another JPATS flight to Lewisburg, West Virginia, for a special USMS movement on March 8, 2021. During a pre-departure medical screening on March 7, 2021, the defendant was determined to have a medical condition [REDACTED FROM PUBLIC FILING]. The defendant was cancelled from the March 8 flight as a result of this medical condition.
>
> The defendant was then scheduled and transferred on a JPATS flight to Harrisburg, Pennsylvania, on March 25, 2021.

(Exhibit J at 1-3.)

[SEALED INSERT #1]

We understand that the defendant arrived in Washington, D.C., on or around March 25, 2021.

***The Indictment***

On March 9, 2021, the grand jury returned an indictment charging the defendant with two violations of 18 U.S.C. § 875(c) (threats in interstate commerce) (Dkt No. 8). On March 29, 2021, the defendant filed a motion to dismiss the indictment alleging a violation of the Speedy Trial Act (Dkt No. 16), and the defendant filed an amended version of the motion to dismiss on April 4, 2021 (Dkt No. 19). The defendant was arraigned on the indictment on April 2, 2021.

**ARGUMENT**

There is no basis to dismiss the pending indictment for any purported violation of the Speedy Trial Act, as the indictment was timely returned within 30 days of arrest after accounting for excludable delay. 18 U.S.C. § 3161(h).

***A. Legal Principles***

The Speedy Trial Act, 18 U.S.C. § 3161, provides that an "indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b).

Section 3161(h) provides for certain periods of delay that "shall be excluded in computing the time within which an . . . indictment must be filed . . . ." 18 U.S.C. § 3161(h). These include:

> (1) Any period of delay resulting from other proceedings concerning the defendant, including but not limited to –
>
> . . .
>
> (D) delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion;

> (E) delay resulting from any proceeding relating to the transfer of a case or the removal of any defendant from another district under the Federal Rules of Criminal Procedure; [and]
>
> (F) delay resulting from transportation of any defendant from another district, or to and from places of examination or hospitalization, except that any time consumed in excess of ten days from the date an order of removal or an order directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable.

18 U.S.C. § 3161(h).

This list of "other proceedings" is "merely illustrative and not intended to be exhaustive," and should be read "broadly." *United States v. Garrett*, 720 F.2d 705, 709-710 (D.C. Cir. 1983). For example, a pretrial conference constitutes an "other proceeding[] concerning the defendant." *United States v. Van Smith*, 530 F.3d 967, 975 (D.C. Cir. 2008). *See also Garrett*, 720 F.2d at 710 (citing with favor the Judicial Conference Guidelines interpreting "other proceedings" to include "preliminary examinations under Rule 5.1, arraignment proceedings, pretrial conferences, depositions under Rule 15, and . . . bail hearings").

The period of delay attributable to "other proceedings" are described as "automatically excludable [because] they may be excluded without district court findings." *Bloate v. United States*, 559 U.S. 196, 203 (2010). Indeed the Supreme Court has rejected the argument that these other proceedings must actually cause delay or the expectation of delay in order for there to be excludable delay under the Speedy Trial Act. *See United States v. Tinklenberg*, 536 U.S. 647, 656 (2011) ("the subparagraphs that specifically list common pretrial occurrences apply automatically . . ."); *id*. at 660 ("We disagree . . . that the Act's exclusion requires a court to find that the event the exclusion specifically describes, here the filing of the pretrial motion, actually caused or was expected to cause delay of a trial. We hold that the Act contains no such requirement.").

If no indictment is filed within the applicable time limit (accounting for excludable delay), the charge contained in the complaint "shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1). In such a circumstance, the dismissal may be with or without prejudice. *Id*. "In determining whether to dismiss with or without prejudice, the court shall consider, among others, each of the following facts: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice." *Id*. Also relevant to the judicial determination is the "presence or absence of prejudice to the defendant." *United States v. Taylor*, 487 U.S. 326, 334 (1988) ("there is little doubt that Congress intended this factor to be relevant for a district court's consideration").

***B. Other Proceedings in the Eastern District of Texas (January 15 – 21)***

The period of seven days from January 15 through 21, 2021, are automatically excluded from the Speedy Trial Act time limits. This is because during that entire time period, there were "pretrial motions" pending in the Eastern District of Texas (18 U.S.C. § 3161(h)(1)(D)), and because the proceedings in Texas were "relating to the transfer of a case or the removal of any defendant from another district" (18 U.S.C. § 3161(h)(1)(E)).

The defendant was arrested in the Eastern District of Texas on January 15, 2021, and that very same day a Rule 5 initial appearance was held to initiate the transfer of the defendant to Washington, D.C. (Exhibit B). Also on January 15, 2021, the United States moved for pretrial detention (*id*.). On January 20, 2021, the defendant filed his own motion for substitution of counsel that was resolved the same day (Exhibits C, D, E). It was not until the afternoon of January 21, 2021, after a combined preliminary and detention hearing, that the Magistrate Judge in the Eastern

District of Texas resolved the transfer proceeding and granted the United States' motion for pretrial detention (Exhibits H, I).

This period of seven days is automatically excluded. Indeed the Speedy Trial Act "excludes the time resulting from 'any pretrial motion.'" United States v. Hemphill, 514 F.3d 1350, 1357 (D.C. Cir. 2008). The D.C. Circuit has described it this way -- "the phrase means what it says: any motion will toll the clock." Id. (emphasis in original). It makes absolutely no difference whether the motion was simple or complicated, or whether the motion actually caused delay. See, e.g., United States v. Wilson, 835 F.2d 1440, 1443 (D.C. Cir. 1987) (refusing to consider whether a pretrial motion caused actual delay when considering whether it excluded time under the Speedy Trial Act). "Any motion may take time to resolve, and the Speedy Trial Act excludes that time from the seventy-day limit." Hemphill, 514 F.3d at 1357. The same is true of the transfer and removal proceedings stretching from January 15 through 21, 2021, which are automatically excluded under 18 U.S.C. § 3161(h)(1)(E).

***C. Transportation From Another District (January 22 – March 25)***

Ten days of delay resulting from transportation of the defendant to Washington, D.C., are automatically excluded from the Speedy Trial Act time limits regardless of whether the delay was reasonable. *See* 18 U.S.C. § 3161(h)(1)(F). The statute imposes a presumption that "any time consumed in excess of ten days from the date an order of removal directing such transportation, and the defendant's arrival at the destination shall be presumed to be unreasonable" *id*., "but the government may rebut this presumption by offering an explanation for the delay." *United States v. Phinizy*, 2019 WL 2570038, *5 (D.D.C. June 21, 2019), *citing United States v. Noone*, 913 F.2d 20, 26 (1st Cir. 1990).

We have presented significant evidence demonstrating that any additional delay in the defendant's transportation was reasonable. *See* Exhibit J. Certainly enough of the transportation time was reasonable to confirm that the March 9, 2021, indictment was timely.

Some of the delay (beginning March 7, 2021) was due to a medical condition (Exhibit J at 3), that resulted in a period of time where transportation could not occur. The medical condition was identified on March 7, 2021, and caused the defendant to be cancelled from a March 8 flight to Lewisburg, West Virginia, as part of the transportation to Washington, D.C. (*id.*). At least two of these days of delay (March 7 and March 8) occurred prior to the return of the indictment.

Additional delay was due to an unprecedented winter storm in mid-February that caused major disruption in much of the country, particularly in the Texas and Oklahoma region (Exhibit J at 2). The State of Oklahoma (where the defendant was located) entered a winter weather State of Emergency beginning on February 12, 2021, and record low temperatures were reported on February 16, 2021 (*id.*). Power and water service outages in the region related to the storm created additional problems throughout Oklahoma, with boil-water recommendations in effect in parts of the state through February 20, 2021 (*id.*). The winter storm caused the cancellation of numerous JPATS flights, including a February 17, 2021, flight that the defendant was available to take (*id.*). And the cancellations caused a subsequent backlog, creating further delay (*id.*). At least the delay for the period from February 12 through February 20 (nine days) is appropriately excluded under these reasonable circumstances. *See, e.g.*, *United States v. King*, 2019 WL 3131118, *3 (W.D. Mich. July 15, 2019) ("The Government showed that weather affected transport from January 28 to February 2, 2019, so the Court will exclude six days for weather-related delays.") (relying on *United States v. Phinizy*, 2019 WL 2570038 (D.D.C. June 21, 2019)).

Further delay was also due to the extraordinary and unprecedented challenges with prisoner transportation that have been created by the COVID-19 pandemic. JPATS has reasonably imposed new measures to protect the public health, that have had the effect of increasing prisoner transportation times. These measures include separating prisoners for travel based upon the nature of the movement, reducing capacity on aircraft and ground vehicles, and requiring that there be a 14-day period of time between an exposure to COVID-19 and any transportation. (Exhibit J at 2.) Additionally, a need to conduct pre-departure medical testing has extended the time it takes to plan prisoner transfer flights, resulting in flight cancellations causing additional delay of 2-3 weeks for scheduling purposes (*id*. at 2-3).

The pandemic-related delays make clear that significant amounts of additional transportation here time were reasonable, including the time between February 9 (the day after an administrative error resulted in the defendant not traveling to Lewisburg, West Virginia) and March 6 (after the winter storm-related cancellation but before the medical condition) (26 days), and the time between January 29 (when the defendant arrived at Grady County Jail) and February 7 (the day before the flight cancellation due to administrative error).

Courts have determined that delays related to the challenges posed by the pandemic are not "ordinary institutionalized delay," but are instead reasonable and excluded under the Speedy Trial Act. *See*, *eg.*, *United States v. Cortez*, 2021 WL 534866, *5 (D. Mass. Feb. 12, 2021) ("in light of the difficulties the COVID-19 pandemic has caused to prisoner transportation and to the operations of detention facilities, here the delay was reasonable, and it certainly was not due to 'ordinary institutionalized delay'") (quoting *United States v. Noone*, 913 F.2d 20, 25 (1st Cir. 1990); *United States v. Durbesula*, 2020 WL 6572640, *4 (W.D.N.C. Nov. 8, 2020) ("The 26 days to transfer

the defendant was reasonable given COVID-19 conditions. . . . The pandemic . . . greatly affected the manner of transportation, the need for the local detention facilities to account for quarantines, and for the Court to address the defendant in light of such quarantines.”).

Additional reasonable delay in transportation time occurred for the reason set forth in our SEALED INSERT #1.

***D. No Basis For a Dismissal With Prejudice***

The indictment was timely, but even assuming that there was a violation of the Speedy Trial Act, there is no basis for the dismissal of the indictment to be with prejudice. In determining whether to dismiss with or without prejudice, the Court must consider the following factors, among others: (1) the seriousness of the offense; (2) the facts and circumstances of the case which led to the dismissal; and (3) the impact of a reprosecution on the administration of this chapter and on the administration of justice. 18 U.S.C. § 3162(a)(2). Prejudice to the defendant is one of other factors the Court may consider. United States v. Bittle, 699 F.2d 1201, 1208 (D.C. Cir. 1983). All of these factors would weigh heavily in favor of dismissal *without* prejudice, if dismissal of any sort were warranted. Courts have determined that “dismissal with prejudice requires a showing of a ‘truly neglectful attitude,’ ‘bad faith,’ a ‘pattern of neglect, or other serious misconduct, as well as prejudice to the defendant.’” *United States v. Gaskin*, 364 F.3d 438, 451 n.3 (2nd Cir. 2004) (*citing United States v. Taylor*, 487 U.S. 326, 338-39 (1988)).

This case is undoubtedly serious. The defendant portrayed himself on social media as a retired military officer and made dangerous threats that were shared tens of thousands of times. The threats targeted law enforcement, politicians, and technology executives, and included instructions to “prepare our weapons” and “hunt these cowards down” (Exhibit A). The crimes

are punishable by up to five years of imprisonment each, totaling ten years. *Cf.*, *United States v. Reina-Del Rosario*, 281 F. Supp. 3d 253, 254 (D.P.R. 2017) (dismissing indictment with prejudice where punishment likely would have been for less time than defendant already spent in detention in a "case of simple illegal reentry"). And these were crimes of violence because they involved the "threatened use physical force against the person or property of another." 18 U.S.C. § 16. *Cf., United States v. Reese*, No. 3:15-CR-299, 2019 WL 3252643, at *2 (M.D. Pa. July 19, 2019) (dismissing indictment with prejudice where offense, forging checks, was non-violent and resulted in minimal damages); *United States v. Fawster*, No. 1:12-MJ-364, 2013 WL 4047120, at *4 (D.R.I. Aug. 9, 2013) (dismissing complaint with prejudice where offense, pulling fire alarms, was non-violent and was among those crimes classified as "the least serious offenses prosecuted in the federal court"). The defendant committed these crimes in the highly-charged environment of January 6, 2021, causing concern among the public and law enforcement. And the defendant has a lengthy criminal history of fraud and impersonating government officials.

The facts and circumstances of the case do not warrant a dismissal with prejudice. As explained above and in Exhibit J, the government diligently made efforts at every stage to swiftly transfer the defendant to Washington, D.C., despite tremendous challenges owing to the COVID-19 pandemic, an unprecedented winter storm, and a medical condition. The defendant did not languish and he was not ignored; the delays were due to medical issues, weather issues, and other reasonable challenges. *Cf. United States v. Montecalvo*, 861 F. Supp. 2d 110, 117 (E.D.N.Y. 2012) (dismissal with prejudice where years passed without any documented effort by the government to move case forward, which demonstrated lackadaisical attitude toward prosecution); *United States v. Peppin*, 365 F. Supp. 2d 261, 266 (N.D.N.Y. 2005) (dismissing indictment with prejudice

where the government overlooked case and demonstrated neglectful attitude causing a 15-month delay). There was no bad faith on the part of the government. If there as any violation of the 30-day requirement (which there was not), it was only by a matter of days. And the defendant was ordered detained pending trial prior to the initiation of the transportation; he was appointed counsel (and later retained counsel), was confronted with live witness testimony, and introduced his own evidence at the two-hour-plus hearing (Exhibit G). So any transportation delays had nothing to do with the fact of his detention, and any delays did not prolong his pretrial detention.

The administration of justice would not be served by a dismissal with prejudice. The USMS and JPATS acted in good faith here to expeditiously transfer the defendant (Exhibit J). The delay conferred no tactical benefit on the government, and certainly was not intended to. *Cf.*, *United States v. Klanseck*, 246 F. Supp. 3d 1198, 1204 (E.D. Mich. 2017) (dismissing indictment with prejudice where the government appeared to have an interest in delay, as it "attempted to hedge its bets by delaying [the] proceedings" to seek additional prison time if its efforts to negotiate a plea in a more severe, but unrelated, criminal proceeding against defendant did not result in satisfactory disposition). Moreover, as numerous courts have recognized, dismissal without prejudice is not a toothless sanction. *See, e.g., United States v. Taylor*, 487 U.S. 326, 342 (1988). It requires the government to expend the resources to seek an indictment (or re-indictment) before bringing the defendant back before the Court, and to risk dismissal under the statute of limitations.

Finally, any delay in transportation caused no prejudice to the defendant's ability to defend against the charges. There can be no credible allegation that the defendant has lost access to witnesses or evidence as a result of any delay or that he is stymied in pursuing his own investigations as a result of any delay. *Cf. Klanseck*, 246 F.Supp.3d at 1205-1206 (dismissal with

prejudice where an important defense witness was no longer available due to delay); *United States v. Mancuso*, 302 F. Supp. 2d 23, 34 (E.D.N.Y. 2004) (dismissal with prejudice where hard drives and other original documentary evidence were lost during delay between arrest and indictment, which could have prejudiced the defense). The defendant was represented by counsel even before the transportation began, and continues to have every ability to pursue an investigation into the charges in this case.

Considering everything – the diligent efforts to transport, the challenges posed by medical issues and weather, the lengthy judicial process afforded the defendant before the transportation, and prior order of pretrial detention, the absence of bad faith or any prejudice – there is no basis for a dismissal with prejudice here. *Cf.*, *United States v. James*, 861 F. Supp. 151 (D.D.C. 1994) (dismissal with prejudice where more than a year of unexcludable delay passed between arrest and indictment, and where the government failed to abide by requirements in the Federal Rules of Criminal Procedure); *United States v. Noble*, 2020 WL 8919263 (W.D. Pa. Dec. 21, 2020) (dismissal with prejudice where defendant detained for four years awaiting trial, and where government and court demonstrated a disregard for the Speedy Trial Act).[2]

[2] For the reasons set forth herein, there is no basis for any of the false allegations stated in the handwritten exhibit attached to the defendant's motion (Dkt No. 19, Exhibit 1). The affidavit in support of criminal complaint established all the essential elements of the crime charged, as so found by the Magistrate Judge in the District of Columbia; subsequently, probable cause was also found by the Magistrate Judge in the Eastern District of Texas (after a lengthy evidentiary hearing) and by the grand jury in returning the indictment. The indictment was timely returned within 30 days of arrest after accounting for excludable delay, including reasonable transportation time. The defendant admitted to authoring the social media posts at issue, and the posts are attached as Exhibit A; there is no factual basis to any false allegation that law enforcement framed the defendant or misrepresented the content of the social media posts at any time.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

By: /MJF/

Michael J. Friedman
N.Y. Bar 4297461
Assistant U.S. Attorney
United States Attorney's Office
555 Fourth St., NW
Washington, D.C. 20001
202-252-6765
Michael.Friedman@usdoj.gov