1

1          UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF TEXAS (SHERMAN DIVISION)

3   UNITED STATES OF AMERICA,
                                    Case No. 4:21-mj-00033-KPJ
4              Plaintiff,

5   v.                              Sherman, Texas
                                    January 21, 2021
6   TROY ANTHONY SMOCKS,            10:11 a.m.

7              Defendant.

8

9        TRANSCRIPT OF PRELIMINARY AND DETENTION HEARING
            BEFORE THE HONORABLE CHRISTINE A. NOWAK
               UNITED STATES MAGISTRATE JUDGE
10

    APPEARANCES:
11
    For the Plaintiff:           Tracey Batson, Esq.
                                 U.S. Attorney's Office
12                               101 E. Park Boulevard
                                 Suite 500
13                               Plano, TX 75074

14  For the Defendant:           James Whalen, Esq.
                                 Ryne T. Sandel, Esq.
15                               Whalen Law Office
                                 9300 John Hickman Parkway
16                               Suite 501
                                 Frisco, TX 75035
17
    Clerk/Court Recorder:        Lori Stover
18
    Also Appearing:              Lorene Dudley, USPO (by phone)
19
    Transcription Service:       Chris Hwang
20                               Abba Reporting
                                 PO Box 223282
21                               Chantilly, Virginia  20153
                                 (518) 302-6772
22

23

24  Proceedings recorded by electronic sound recording;
    transcript produced by transcription service.
25

1                              **INDEX**

2

3                                                    Page
   Court's Ruling                          93
4

5   WITNESSES FOR PLAINTIFF/GOVERNMENT

6                          Direct    Cross     Redirect    Recross

7   Kendrick Chumak          7        40          62         70

8

9   WITNESSES FOR DEFENDANT
    None
10

11  EXHIBITS                                OFFERED    RECD

12      Defendant's 1 and 2                   44        44

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Call to order at 10:11 a.m.)

2          THE COURT:  All right, good morning, everyone.  At

3    this time, the Court's going to go ahead and proceed to call

4    cause number 421-mj-33, the United States of America v. Troy

5    Anthony Smocks

6          If I can have an appearance on behalf of the

7    Government, please?

8          MS. BATSON:  Yes, Your Honor, Tracey Batson for the

9    Government and we're ready to proceed.

10         THE COURT:  If I can have an appearance on behalf of

11   Mr. Smocks?

12         MR. WHALEN:  James Whalen and Ryne Sandel for Mr.

13   Smocks, Your Honor.

14         THE COURT:  All right, good morning.

15         And, Mr. Smocks, I know that you're already seated,

16   but I am going to ask for them to swivel that microphone around

17   to you.  And if you can just tell me your full name for the

18   record, please, sir?

19         THE DEFENDANT:  Troy Anthony Smocks.

20         THE COURT:  Thank you.  Everyone, I'm recap the

21   Court's understanding of where we are in connection with this

22   case procedurally just to confirm that we are all on the same

23   page.

24         Mr. Smocks had his initial appearance on January 15th

25   before Judge Johnson out of our Plano courthouse.  This is on a

1    complaint that is out of district.

2              Notwithstanding that fact, Mr. Smocks has requested

3    to have both his preliminary and detention hearings here today.

4    And we are scheduled to go forward on those.

5              I'm just going to confirm, Ms. Batson, do you concur

6    that that is the procedural history of this case?

7              MS. BATSON:  Yes, Your Honor.

8              THE COURT:  And Mr. Whalen?

9              MR. WHALEN:  Yes, Your Honor.

10             THE COURT:  And so is there any objection to the

11   Court taking up the preliminary and detention hearing, running

12   those together?

13             MS. BATSON:  No, Your Honor.

14             MR. WHALEN:  No, Your Honor.

15             THE COURT:  And as well I'd like to confirm at this

16   time, Ms. Batson, is the Government asserting that this is a

17   presumption case?

18             MS. BATSON:  It's not a presumption case because the

19   maximum is five years.

20             THE COURT:  All right, and has the Government had an

21   opportunity to review the Pre-trial Services Report and its

22   recommendation for detention?

23             MS. BATSON:  Yes, Your Honor.

24             THE COURT:  Other than any information that will come

25   out through the course of the hearing, are there any errors or

1  omissions in that report that you would care to bring to the

2  Court's attention at this time?

3        MS. BATSON:  Not at this time, Your Honor.

4        THE COURT:  Mr. Whalen, I'm going to ask you those

5  same questions.  Do you concur with Ms. Batson this is not a

6  presumption case?

7        MR. WHALEN:  I agree, Your Honor.

8        THE COURT:  Have you had an opportunity to review

9  that Pre-trial Services Report?

10       MR. WHALEN:  I have, Your Honor.

11       THE COURT:  And other than any evidence that will be

12  brought up through the course of the hearing, are there any

13  errors or omissions in it that you care to bring to the Court's

14  attention at this time?

15       MR. WHALEN:  No, Your Honor.

16       THE COURT:  So are each of you prepared to proceed?

17       MS. BATSON:  Yes, Your Honor.

18       MR. WHALEN:  Yes, Your Honor.

19       THE COURT:  All right, the Government may call its

20  first witness.

21       MS. BATSON:  Your Honor, we call Special Agent

22  Kendrick Chumak.

23       THE COURT:  Thank you.

24

25

1        KENDRICK CHUMAK

2   called as a witness for the Government/Plaintiff, having been

3   duly sworn testified as follows:

4            THE COURT:  All right, so once you're seated, it's

5   entirely your discretion whether you leave your mask on or not.

6   You may take it off if you feel more comfortable.  If you would

7   rather, you may leave it on.

8            If you do leave it on, I am going to ask for you to

9   increase the volume of your voice, so that we're all able to

10  hear you this morning.

11           THE WITNESS:  Understood.

12           THE COURT:  At this time, if I could ask for you to

13  please state your full name for the record?

14           THE WITNESS:  My name is Kendrick Chumak.

15           THE COURT:  Thank you.  And can you please spell that

16  as well?

17           THE WITNESS:  K-E-N-D-R-I-C-K C-H-U-M-A-K.

18           THE COURT:  Thank you very much.

19           All right, Ms. Batson, at this time, you may proceed.

20  Ms. Batson, I'm going to give you that same admonition.  You're

21  more than to welcome to keep the mask on.  However if you do, I

22  am going to ask for you to increase the volume of your voice.

23           MS. BATSON:  I will take it off, Your Honor.  Thank

24  you.

25           THE COURT:  All right, thank you.

1            MS. BATSON:  And may I proceed?

2            THE COURT:  You may.

3            MS. BATSON:  Thank you.

4                        DIRECT EXAMINATION

5    BY MS. BATSON:

6        Q    Please state your name.

7        A    Kendrick Chumak.

8        Q    And how are you employed?

9        A    I'm employed as a special agent of the FBI.

10       Q    Okay, and how long have you been employed in that

11   capacity?

12       A    Since May of 2017.

13       Q    And to what division are you currently assigned?

14       A    Domestic terrorism.

15       Q    Now you are the case agent on this case involving

16   Troy Smocks, correct?

17       A    I am.

18       Q    And can you please give the Court a summary of the

19   investigation?

20       A    So, basically, we became aware of this between

21   January 6 of 2021 and approximately January 9th of 2021.  The

22   FBI received countless tips from concerned citizens around the

23   country from various states, stating that they provided

24   screenshots of a Parler account, which was going to by the name

25   of Colonel Troy Perez, also Colonel 007, in which threats of

1    violence were made and incitement of others to commitment

2    violence were made.

3         That got brought to our attention.  The FBI then

4    proceeded to execute legal process, the emergency order to

5    Parler, LLC.

6         It was determined that subscriber information from

7    that return, excuse me, subscriber information from that return

8    revealed an email address, a telephone number, and an IP

9    address.

10        The IP address came to -- came back to Dallas, Texas.

11   The phone number was then further investigated.  And it was

12   determined that the subscriber to that phone number was a Troy

13   Perez (phonetic), also a Troy Smocks.

14        That phone number was then further investigated.  And

15   the photographs of Mr. Smocks were identified, which match the

16   same photo that was in Mr. Smocks' Texas driver's license to

17   positively identify him.  Those two --

18        MR. WHALEN:  Your Honor, I object to the narrative.

19        THE COURT:  Your objection was to what?  Okay, ask a

20   favor of you.  If you'll back off that microphone just a little

21   bit, it will decrease the squealing sound, okay?

22        THE WITNESS:  Okay.

23        THE COURT:  All right, thank you, Ms. Batson.

24   BY MS. BATSON:

25        Q    Okay, and what happened next?

1        A     So we looked at the -- there were two specific posts

2    that were actually three, but three posts that were kind of

3    redundant in all those different tips that we're receiving.

4        One was prior to the January 6th events at the Capitol,

5    where Colonel 007 had posted kind of looked like a general

6    warning to others where the writer stated to prepare food and

7    water, that basically civil unrest was going to be happening

8    between the 18th and the 24th of January, that would -- that

9    individuals needed to prepare their weapons, needed to prepare

10   to supplement and help the United States military, stated that

11   law enforcement would have no authority during this time and

12   that private citizens would need to start patrolling their

13   neighborhoods to keep things safe.

14       The second post was --

15       Q     Just to be clear before we move from that post, just

16   to be clear, the post indicated that there was going to be

17   unrest between December 18th and the 24th?

18       A     Yes, that's correct.  I -- yes.

19       Q     Okay, all right, go ahead.

20       A     There was an additional post that Colonel 007 also

21   wrote on January 6th, 2021 in which he stated he was going to

22   return to the Capitol on January 19th of 2021, carrying our

23   weapons was the term that was used, that he would return with

24   more individuals, that would be a day that would kind of go

25   down in history, I believe is what it said, and that no

1    standing army or police agency would be able to match their

2    numbers.  That was viewed approximately or more than 60,000

3    times by our indications.

4        A secondary post posted on January 7th stated that people

5    needed to prepare their weapons, that they needed to hunt down

6    cowards and traitors.

7        And I believe it specifically mentioned Republicans,

8    Democrats, and tech executives.  And then the post was ended

9    with a general statement stating that today we took the

10   Capitol.  It's not the building we wanted, it was them.

11       So, obviously, those three posts that were reported were

12   concerning to lots of U.S. citizens because we were getting

13   phone calls and tips throughout those days.

14       There was also a YouTube -- throughout the investigation,

15   we also determined that there was a YouTube channel that was

16   owned by Colonel T. Perez.

17       There was one video that we located from approximately

18   July 2020 in which Mr. Smocks was depicted in what appeared to

19   be a military-style uniform, BDUs or battle dress uniform,

20   perhaps with a jacket off wearing an olive green or tan shirt.

21       The title of the video was "These Armed Protesters are

22   Bitch Babies".  And if you listen to the video, it appears that

23   he was basically trying to mobilize other veterans to commit or

24   to basically go to armed protest.

25       So, following that, we --

1          MR. WHALEN:  Object to the narrative.

2     BY MS. BATSON:

3          Q     Then what happened next?

4          A     So that following that, we looked -- we identified

5     his apartment, that he lived at Preston Heights Apartments.

6     Mr. Smocks was seen leaving Apartment 20A and getting into a

7     Jaguar sedan.  That license plate was checked with vehicle

8     registration and did -- was registered for him -- to him.

9          We also identified a Toyota Tacoma truck parked in the

10     driveway that was registered to him.  Contact was made with the

11     leasing office of Preston Heights Apartments.  They provided a

12     apartment lease application with Mr. Smocks' name and

13     information on it.

14          On that application, he identified himself as currently

15     employed by NetJets and his former employee was a U.S. Army and

16     he identified him as lieutenant colonel.

17          He identified his former employer as the First SFOD-D,

18     which is the First Special Forces Operational Detachment/Delta,

19     commonly known as Delta Force or Delta.

20          In addition to that, the leasing office provided a

21     photocopy of a fraudulent FAA pilot certificate, indicating

22     that Troy A. Smocks was a commercial pilot and also a

23     fraudulent NetJets ID on a lanyard, indicating that he was an

24     employee of NetJets, which also was false.

25          Following that, a subsequent search warrant, an arrest

1    warrant was executed on the morning of January 15th and Mr.

2    Smocks conducted a voluntarily -- voluntary custodial

3    interview.

4        Q    Okay, and let's -- we'll come back to the rental

5    application information that Mr. Smocks put on there, but what

6    was recovered during the search warrant?

7        A    During the search warrant, there were -- there was a

8    freestanding personal computer, a laptop, a tablet, an iPad,

9    three cellular phones, multiple SD cards, multiple thumb

10   drives -- there -- two knives, a revolver.

11       There was also a bag that appeared to have -- they were

12   full of fraudulent documents.  There was a DD214 that was

13   recovered.  There was a fraudulent military ID that had Mr.

14   Smocks' picture that identified himself as a lieutenant colonel

15   or colonel in the United States Army.

16       There was also a printing/laminating a machine, appeared

17   to be used for making fraudulent IDs, a box full of several

18   white, what we refer to as common access cards, white cards

19   with the little gold chips on them that would be used in the

20   military or in government service.

21       Q    Now prior to the execution or the obtaining and then

22   the execution of the search warrant, had you all received

23   information that Mr. Smocks was scheduled to fly out of

24   country?

25       A    We did.  So we were process served on Southwest

1    Airlines, which indicated that Mr. Smocks did book a flight and

2    did travel to Washington D.C., Reagan National Airport on the

3    5th and then -- of January and then returned back to the

4    Dallas/Fort Worth National -- International Airport on the 7th.

5           Legal process search of American Airlines revealed that he

6    had recently travelled to the Dominican Republic over the New

7    Year's holiday and was intending to go back to the Dominican

8    Republic on the 15th of January with a scheduled return flight

9    on the 24th of January.

10          Q    Okay, so nine days later, he was going leave on the

11   15th --

12          A    Approximately nine days later.

13          Q    Come back on the 24th?

14          A    That is correct.

15          Q    And was there any information recovered during the

16   search warrant that related to his travel?

17          A    Yes, we found the Southwest booking information for

18   the trip from Dallas/Fort Worth International Airport to Reagan

19   International Airport.

20          Q    Okay, during the time frame of January 5th to January

21   7th?

22          A    Yes, that's correct.

23          Q    Okay, and just to note for the record, the

24   insurrection at the Capitol happened on what day?

25          A    On January 6th of 2021.

1          Q      Okay, now you indicated that after execution of the

2     warrant, and Mr. Smocks was arrested, that he interviewed with

3     law enforcement?

4          A      That's right.

5          Q      Okay, and was he read Miranda?

6          A      Yes, he was.

7          Q      All right, and he waived his Miranda and agreed to

8     speak with you?

9          A      Yes, he did.

10         Q      Okay, now can you give the Court a short summary of

11    the interview that you conducted with Mr. Smocks?

12         A      So the highlights of the interview, I would say, are

13    that Mr. Smocks admitted to travelling to Washington, D.C.  He

14    was present on U.S. Capitol grounds.

15         He stated that he went there as a invitation -- invited by

16    the President, was there to peacefully exercise his First

17    Amendment rights, stated that he did not enter the Capitol,

18    that he was approximately 500 to 1,000 feet away witnessing

19    what was occurring.

20         He said that he stayed at a hotel there, travelled by

21    himself, did not meet with anybody, admitted to having the

22    Parler account Colonel T. Perez, Colonel 007, discussed how he

23    used his telephone.

24         He identified his telephone number, which is the same one

25    that we got back through the subscriber information through

1    Parler, talked about how he established that Parler account.

2         He went into detail as to those specific posts that

3    we -- I mentioned earlier.  And he tried to argue semantics

4    about what certain words meant.  So we went through that back

5    and forth.

6         He talked about -- we also talked about some of the things

7    that were found at his apartment to include the ID machine and

8    the fake IDs or not the fake IDs, excuse me, the blank common

9    access card IDs.

10        We talked about his international travel.  We discussed

11   some of his friends, wife, other people that lived

12   internationally.

13        We talked about how he made his money.  And he discussed

14   wire transfers that he made to some of these people overseas.

15   And I believe that was generally about it.

16        Q    And so, let's talk about his travel to D.C. on

17   January 5th.  He admitted that he was there.

18        A    Yes.

19        Q    Okay, and did he -- specifically, what did he say

20   about the reason he was there?

21        A    He said he was there at the invitation of the

22   President of the United States to attend -- to listen to the

23   President speak and attend a rally and exercise his First

24   Amendment rights.

25        Q    Okay, and when did he say that he began to

1   participate in the march?

2       A    So he stated that he was listening to the President

3   speak.  At some point during that speech, the President had

4   mentioned marching to the Capitol.

5       And then, he said he at some point joined that march.  He

6   said he was not in the front, relatively far behind in the

7   march.

8       And that by the time he had gotten to the Capitol, I think

9   he described it as the chaos had already ensued and he just

10  kind of watched it from afar.

11      Q    Okay, and did he make any statements about the

12  President, his duty as an American as called to by the

13  President?

14      A    He did.  He stated several times that if the

15  President gave him an illegal order, that he would follow it as

16  long as was not immoral.

17      He also stated that all American citizens have a duty to

18  rise up.  I'm trying to remember the term that he used.

19  Basically, if the President ordered American citizens to rise

20  up and defend the country, that they had a duty to do so.

21      Q    Okay, rise up perhaps with firearms?

22      A    Yes.

23      Q    Okay.

24      A    He didn't specifically say firearms, but I would say

25  it was implied.

1    Q    Okay, and until the President says go in peace?

2    A    Yes, that's correct.

3    Q    All right.  And then, who did Mr. Smocks believe that

4 the United States was at war with?

5    A    So, during the interview, he said that he believed we

6 were at war with China.

7    Q    Okay, did you all discuss how he came to be called

8 the Colonel?

9    A    We did.

10    Q    And what conversation took place on that topic?

11    A    So Mr. Smocks tried to make us believe that he was

12 not trying to pose as a colonel or lieutenant colonel of the

13 United States Army.

14    He claimed that it was something that he just made up

15 similar to Colonel Sanders from KFC.  Gave a story that he

16 played softball at some point in time in his past and that some

17 of his teammates said that he was better at softball than the

18 captain of the team.  So they gave him the nickname Colonel and

19 that he just kind of used that.

20    Q    Okay, and just to repeat, his account had the name

21 colonel in there?

22    A    It did.

23    Q    Okay, and the leasing information from the apartment

24 he -- where did he indicate that -- did he indicate he had been

25 in the Army?

1   A    Yes, he indicated his prior employer was the United

2   States Army, that his supervisor was a general, that his rank

3   was lieutenant colonel, and that he was stationed at Fort Bragg

4   in North Carolina.

5   Q    Okay, now have you been able to confirm whether or

6   not Mr. Smocks was indeed in the Armed Forces?

7   A    We did.  During our investigation, we contacted DOD,

8   who indicated that there was -- they had no record of a Troy

9   Smocks ever serving the United States military.

10  Q    Okay, now did Mr. Smocks have a response or comment

11  to the fact that there was no record of him being in the

12  military?

13  A    He did.  He stated quite ambiguously that he had

14  served in the Army some time back in the '80s, that he had

15  enlisted, that he had been stationed at Fort Sill and Fort

16  Hood, that he received a general discharge.  He did not finish

17  his three-year enlistment.

18      And he stated something about that DOD had somehow lost

19  his record, but that it had been established through prior

20  court proceedings that he did serve in the U.S. Army as a -- I

21  think it was a Military Occupational Specialty or MOS as it's

22  generally called as 11 Bravo, which is a field artillery

23  infantry, I believe.

24  Q    Okay, and then, so Mr. Smocks said that it had been

25  confirmed in a prior court proceeding that he was in the

1    military?

2         A    Yes, that's what he stated.

3         Q    Were you able to figure out what he was referring to?

4         A    No, I was not.

5         Q    Okay, but he indicated that he was a colonel in

6    United States Army and had received a general discharge?

7         A    During the interview, he said he was enlisted and he

8    had received a general discharge.

9         Q    Okay.  Did you ever ask him if he had ever

10   impersonated a military officer?

11        A    I did.

12        Q    And what was his response?

13        A    He said that he had impersonated several types of

14   people in his past, but that he had gone to counselling for it

15   and that he didn't do that anymore.

16        Q    Okay, and did he indicate what other individuals he

17   had impersonated?

18        A    He did not.  He didn't wish to talk about that.

19        Q    And did you ask him or did the topic come up whether

20   he had ever created a false military ID?

21        A    He did.  He was shown one of the IDs that was

22   recovered at the search that had his picture, identified

23   himself as a lieutenant colonel if I recall correctly.

24             And it said that it was valid INDEF, I-N-D-E-F, which

25   would be for indefinite.  And I'm aware that typically, the

1   military doesn't do that.

2       So we showed him a picture of that ID.  And he stated that

3   that was him, that he has made that -- I think he said some

4   years ago.

5       Was very cryptic as far as when he made it.  Wouldn't

6   specifically answer and pointed out that the photograph was

7   him, but it was him at a much earlier age than currently.

8       Q    Okay.  Now also, let's talk about the travel.  All

9   right, so you had stated that prior to execution of the

10  warrant, you had information he was going to travel out of the

11  country?

12      A    I did.

13      Q    Okay, and where was he scheduled to travel?

14      A    The Dominican Republic.

15      Q    Okay, and during the course of the investigation,

16  you -- I think you already testified that he had travelled to

17  the Dominican Republic over the holidays?

18      A    Over the New Year holiday, that's correct.

19      Q    And do you recall when he left and when he came back?

20      A    I do not recall when he left.  I believe he came back

21  on January the 4th.

22      Q    Okay.

23      A    Of 2021.

24      Q    And then, in your discussions with Mr. Smocks about

25  his travel, did he indicate that he travelled frequently

1    internationally?

2         A    He did.

3         Q    Okay, and did he indicate that he had contacts in

4    other countries?

5         A    He did.

6         Q    And who were those contacts?  Did he mention them?

7         A    He said he had a wife by the name of Bernadette

8    (phonetic), who resided in the Philippines.  When we discussed

9    some of the individuals that he had transferred money to, he

10   mentioned a lady friend by the name of Anna (phonetic), who

11   lives in the Dominican Republic, who he said he recently

12   had -- I'm sorry, he had transferred money to in the past.

13        Talked about a -- said that the people he was visiting in

14   the Dominican Republic were his friends, that he had friends

15   down there.

16        We asked him to clarify that.  He kind of talked about how

17   in his single days prior to being married that he used to get

18   on online dating websites.  And he had some lady friends that

19   he met through that that were in the Dominican Republic.

20        Discussed one male friend from the Dominican Republic that

21   he said that met in the Dallas area at some point.

22        And then, he also mentioned a woman by the name of Gianne

23   (phonetic), who he stated lived in either Hungary or Turkey,

24   who he had loaned -- he had met when he was an Uber driver here

25   in Dallas.

1          She was a Harvard-educated medical doctor and apparently

2     had run out of money when she was here.  So he loaned her

3     $8,000.

4          She had since returned to either like I said Turkey or

5     Hungary.  Eventually wired him back that money as a loan

6     repayment.  So he mentioned those three specific foreign

7     contacts.

8          Q    Okay, and he indicated that his wife was living out

9     of the country?

10         A    Yes.

11         Q    Okay, and where did he say that she lived?

12         A    The Philippines.

13         Q    That she lived in the Philippines?

14         A    He said -- I think he said that she was in the

15    Philippines.

16         Q    Okay.

17         A    So I took that to mean as she resided from there.  He

18    could have meant it as she's from there, but it was pretty

19    clear to me that it meant that's where she was currently

20    located.

21         Q    Okay.

22         A    The word he used was she's in the Philippines, so I

23    think that's up for interpretation.

24         Q    Okay, but not Japan?

25         A    No, he never mentioned Japan in the interview.

1    Q    Okay.

2    A    He mentioned -- when he talked -- I did ask him like,

3  hey, what other places have you gone to internationally other

4  than the Dominican Republic?  He mentioned Korea, he mentioned

5  Japan, and that was it.

6    Q    Okay.  Right, and was his passport recovered during

7  the search warrant?

8    A    It was.

9    Q    Okay, and you currently have that for --

10    A    That is in FBI custody, yes.

11    Q    Okay.  Now in your interview with Mr. Smocks, did you

12  all discuss whether or not he had the intent to go back to D.C.

13  before the Inauguration?

14    A    We did.  We discussed the semantics almost word by

15  word of the two posts that he made in detail.  He stated that

16  he did not have an intention to go back to D.C. for the

17  Inauguration.

18    Q    Okay, and initially, that was confirmed by the fact

19  that he had a ticket that would put him out of the country from

20  January 15th to January 24th; is that correct?

21    A    He did have a ticket putting him out of the country

22  at that point, but I would say to assume that he was going to

23  go on that travel would be an assumption.

24    Q    Okay, and in fact, he didn't go?

25    A    He did not.  He cancelled it the -- that night, late

1    night on the 14th.

2         Q    Okay, so he had a ticket to fly out on the 15th,

3    right?

4         A    Correct.

5         Q    And he didn't go?

6         A    He did not.

7         Q    And did he indicate to you why he decided not to

8    travel?

9         A    He said he was tired.

10         Q    Okay, and did he indicate any other reason for him

11   not making that flight?

12         A    So at the beginning of the interview, we asked that

13   specific question and all he said was he was tired.  Towards

14   the end of -- after about two hours of interviewing, I

15   re-engaged and re-asked the question again and asked for more

16   clarification, because I didn't believe him that he would just

17   cancel tickets because he was tired.

18         So he offered up additional information and stated that

19   his niece and nephew were supposed to be visiting Dallas to

20   look for housing and that they needed a place to stay, so

21   that's why he cancelled it.

22         Q    Okay.  And then you just testified that it would be

23   an assumption to assume that he was going to make that trip?

24         A    Yeah, so in my experience as a FBI special agent,

25   just because somebody books travel doesn't mean they're going

1    to take it.

2         Sometimes it's done as a way to throw off law enforcement,

3    because individuals are aware that we can monitor those kind of

4    things to be either give them an alibi and/or place them

5    somewhere else at the time of the crimes being committed.

6         So it wouldn't beyond -- be beyond the realm of

7    possibility for someone to book a flight, not get on that

8    flight, and instead drive to a particular location to commit

9    its kind of violation or crime.

10        Q    Okay.  Now when you spoke with Mr. Smocks, did you

11   all talk about his Parler account?

12        A    Yes, we did.

13        Q    Okay.

14        A    In detail.

15        Q    And what specifics did you all discuss about his

16   Parler account?

17        A    So he walked us through that he learned about Parler

18   from watching the Dan Bongino show, that he was aware that Mr.

19   Bongino was somehow associated with Parler.  So he looked into

20   it.

21        He registered the account with his cellular phone number.

22   He said that he was the only person who had access to that

23   account, that he registered - he believes he registered that

24   account in approximately December of 2020.

25        The investigation indicated that he registered that

1    account in November of 2020.  So he hasn't had it very long.

2         He indicated that he had posted perhaps six or seven times

3    total.  He talked about a post that he had posted talking about

4    recommending people get food and water for 10 days because of,

5    you know, what he believed was going to be upcoming civil

6    unrest that was going to happen.

7         And stated that the day following that post, that all of a

8    sudden out of the blue, he had approximately 30,000 followers.

9         We showed him a picture or a screenshot of the Parler

10   account for Colonel 007, Colonel T. Perez.  He said that was

11   him.

12        We asked -- or I asked if, you know, if he -- the title of

13   colonel was used as a way to portray himself as a retired

14   colonel because it said Colonel T. Perez and in parenthesis it

15   says capital R, lower case e-t period and then closed

16   parenthesis, which is how members of the military or former

17   members of the military would identify themselves as retired.

18        He claimed that he just used that because he considered

19   himself a retired person.

20        We've already talked about the title of colonel and why he

21   used that.

22        And then, we went through a couple of posts specifically

23   to talk about the semantics and the wording on there.  And he

24   was very evasive with how he answered those questions.

25        Q    Okay, and did you all discuss the deletion of his

1    Parler account?

2        A    We did.  So I believe he stated that, if I recall

3    correctly, he stated that on the 7th of January, his Parler

4    account was deleted.

5        I asked him if he had ever set it to private because at

6    one point, the account was public and then at some other point

7    in time the account was private.

8        He said that he never put it to private.  So he's like

9    maybe Parler did it.  He did comment that, you know, as of the

10   date of the interview, that his Parler account didn't exist

11   anymore because it was taken offline.

12       Q    He said he didn't shut it down?

13       A    He said he didn't -- he said he didn't put into a

14   private setting and that he did not delete his account, that's

15   correct.

16       Q    Okay, and again, what was the Parler account, the

17   name on the Parler account?

18       A    Colonel T. Perez, Retired, Colonel007@Colonel007.

19       Q    Okay.  Now the -- you indicated earlier that Mr.

20   Smocks was observed coming out of a particular apartment

21   complex and that you had gotten his driver's license, saw his

22   picture on there?

23       A    That's correct.

24       Q    Is that correct?  And that you had watched a YouTube

25   video and in that YouTube video, was that the one where he was

1   basically calling people to arms?

2       A    Yes, the title of the video was "These Armed

3   Protests -- These Armed Protesters Are Bitch Babies".

4       Q    Okay.

5       A    And he appeared to be in what could be, like I said,

6   a BDU military uniform with the jacket off.  He did have a

7   camouflage hat that was not a military hat.  It was like a

8   Trump hat of some kind.  And he seemed to be calling on

9   veterans to mobilize and commit armed protests.

10      Q    Okay, but he's visually seen in that YouTube video?

11      A    Yes, he appears to be standing in a garage.

12      Q    Okay, and then, you personally interviewed him?

13      A    I did.

14      Q    Okay, and he admitted he was Troy Smocks?

15      A    He did.

16      Q    And you discussed the events of the charges?

17      A    We did.

18      Q    Okay, and do you see that person here in the

19   courtroom today?

20      A    I do.

21      Q    Okay, and can you point him out and describe I guess

22   an article of clothing that he's wearing for the Court?

23      A    He is sitting in the middle of the table to my right,

24   wearing a striped uniform of light gray and dark gray with a

25   face mask on.

1          MS. BATSON:  Okay, Your Honor, may the record reflect

2     that the witness has identified the Defendant Troy Smocks?

3          THE COURT:  The record shall so reflect.

4     BY MS. BATSON:

5     Q     Now let's discuss -- we'll get to the aliases in a

6     minute, let's discuss his -- the employment.  On his record,

7     the rental agreement for the apartment, do you recall what

8     employment that he listed?

9     A     He listed --

10    Q     Current employment that he listed?

11    A     He listed his current employment at the time that he

12    filled out the application for Preston Heights Apartments as

13    NetJets.

14    Q     And do you know what NetJets is?

15    A     NetJets is a charter aviation company that basically

16    allows individuals to basically buy in and fly on corporate

17    business-type jets versus commercial airlines like through --

18    Q     Okay.

19    A     -- the normal carriers.

20    Q     Now did you receive any information during the

21    investigation that Mr. Smocks had portrayed himself to be a

22    pilot?

23    A     Yes.

24    Q     Okay, and what information did you receive?

25    A     So, in the application, he listed his current -- he

1    listed his current employer as NetJets.  He had a fraudulent

2    FAA pilot certificate, paper pilot certificate that he

3    provided, as well as a fraudulent NetJets employee ID on a

4    lanyard.

5        During the search, one of the other agents at the scene

6    interviewed a resident of Apartment 14F, who was a neighbor,

7    who stated that according to the neighbor, Mr. Smocks was

8    employed as some kind of government pilot.

9        Also during the interview, I asked him if he had

10   ever -- you know, what he told people he did for employment, if

11   he'd ever told anyone he was a pilot and he said yes.

12       He also stated that the FAA pilot certificate was made by

13   him, as well as the NetJets ID was made by him.

14       Q    Okay, so he indicated that he did hold himself out to

15   be a pilot, but then he admitted that the pilot's license and

16   that he wasn't a pilot?

17       A    Correct.

18       Q    Okay, and that he had falsified those documents?

19       A    Correct.

20       Q    Okay, including the NetJet documents?

21       A    Yes.

22       Q    Okay.  And on those NetJet documents, or that he

23   provided to the leasing apartments, did he indicate what his

24   annual salary was?

25       A    On the apartment application, it was approximately

1    between $65,000 and $69,000 a year.

2         Q    Okay.  And again, false?

3         A    Yes.

4         Q    Okay.  Now the pilot license, the FAA license, you

5    said that was fraudulent?

6         A    Yes.

7         Q    And he admitted that?

8         A    Yes.

9         Q    And did you confirm that as well?

10        A    I did.  FAA had no airman certificate records or any

11   record of a Troy A. Smocks holding any type of rating to

12   include commercial pilot, fix wing rotary, or airline transfer

13   pilot.

14        Q    Okay, and again on the same apartment application, he

15   indicated that he had been in the Army?

16        A    That's correct from -- excuse me from -- it was for

17   30 years of service ending 2014.  So that would say that he

18   started in I think -- what is that 1994?  It was for -- yeah,

19   he put years of service on that there as well.

20        Q    Okay.  And did he indicate during your interview, not

21   on the apartment application, but on the interview how he was

22   currently employed?

23        A    He stated that he owned and managed a biohazard

24   cleanup company and then also made money as an author.  And

25   that he stated those were his only two sources of employment.

1      Q     As an author?

2      A     As an author, yes, that's correct.

3      Q     Okay, were you able to determine if he ever authored

4   a book?

5      A     Yes, he was -- he has a Amazon account, where he

6   wrote at least one book that identified.  He portrays himself

7   as an individual who can provide counseling and advice on

8   dating for women.

9      Q     It's a book for giving dating advice?

10     A     Yes, for women to learn how to date men or how to get

11  dates from what I surmised.

12     Q     Okay.  All right, and this bio -- what is it a

13  biohazard or bio --

14     A     Biohazard cleanup company?

15     Q     Yeah.  That's what he said he did?

16     A     Yes.

17     Q     Okay, and what was the name of that company?

18     A     74 Delta.

19     Q     And does that have any significance related to Armed

20  Services?

21     A     So, coincidentally, 74 Delta is also the military

22  occupational specialty or MOS for CBRN, chemical, radiological,

23  nuclear, and bioweapon specialty if you will.

24     Q     Okay, and during your investigation, were you able to

25  confirm whether or not Mr. Smocks was employed or was a manager

1    or co-owner or owner of this company?

2         A    I was not.

3         Q    Now you mentioned that Mr. Smocks had a few aliases?

4         A    Yes.

5         Q    Okay, and during the course of your investigation,

6    did you have an opportunity to look at his criminal history or

7    any materials related to his prior convictions or arrests?

8         A    I did.

9         Q    Okay, were you able to determine that Mr. Smocks has

10   a pattern of impersonating law enforcement?

11        A    Yes.

12        Q    Okay, and was there an incident in 1992 in which he

13   impersonated a DEA agent?

14        A    There was.

15        Q    Okay, and can you tell the Court the facts on that

16   investigation?

17        A    So my understanding of his criminal history, he has a

18   long history of impersonating federal agents from a variety of

19   agencies.

20        In 1992, he portrayed himself as a DEA agent, the Drug

21   Enforcement Agency.  He showed up to a search warrant that was

22   in progress wearing a DEA T-shirt, and had handcuffs on his

23   person, engaged with law enforcement at the scene, identified

24   himself as a DEA agent, provided information on a murder

25   suspect that he stated he needed help to locate.

1          Personnel resources, money were used to identify and help

2     find that person.  Turns out it that was -- it turned out that

3     it was a false report, so that person was not actually the

4     suspect in the murder.

5          Subsequent background investigation was run on Mr. Smocks.

6     It was determined that he -- at that time he was not in fact a

7     DEA agent, nor had he ever been a DEA agent in the past.

8          Q     Okay, so he shows up impersonating a DEA agent.  Law

9     enforcement rallied around the information that he provided and

10    it turned out to be false?

11         A     That's correct.

12         Q     Now did he indicate -- well, was he initially

13    confronted with the fact that officers didn't believe he was a

14    DEA agent?

15         A     I don't recall.

16         Q     Okay.  And you said he showed up with a firearm?

17         A     He showed up with handcuffs.  I don't recall if he

18    had a firearm on his person at that particular event.

19         Q     Okay, did he -- do you recall him making any

20    statements at a subsequent date that he was a male dancer?

21         A     Yes, during that same incident, he had been or it was

22    reported that he had worked as a bouncer at some kind of exotic

23    bar or strip club.  It wasn't really clear.

24         And that he had executed several citizens arrests, I

25    believe four, in which he identified himself as a federal

1  agent.  It wasn't specific as to which agency.

2       Q    Okay.  Now it was 1992, the misrepresentation of the

3  DEA agent.  In 1993, are you aware of another incident where he

4  impersonated another federal agent?

5       A    Yes.

6       Q    And then, can you tell the Court the details, please,

7  when that happened?

8       A    So while he was still on bond for the arrest and

9  conviction for impersonating a DEA agent, the following year in

10  1993, Mr. Smocks decided to transition over to the Secret

11  Service.

12       So he went to a female -- a residence that was occupied by

13  a female, identified himself as an agent of the Secret Service,

14  stated to the female of the residence that he was looking for

15  someone who matched her description, and if she was the person

16  he was looking for, he would have to arrest her at that time.

17       Obviously, her being concerned, she contacted 911.  An

18  investigation was conducted and it was determined that Mr.

19  Smocks was not a Secret Service agent at that time, nor has he

20  ever been employed as a Secret Service agent.

21       Q    Okay, and then when the woman called to -- because

22  she had concerns, did she indicate that Mr. Smocks was carrying

23  a weapon at that time?

24       A    Yes, he did have what appeared to be a firearm in a

25  holster.

1      Q      And he threatened to arrest her?

2      A      That is correct.

3      Q      Okay.  Moving to 1995, did he again impersonate a

4   federal agent?

5      A      Yes, he did.

6      Q      And what are the facts surrounding this

7   impersonation?

8      A      So, in 1995, he walked into a police department,

9   identified himself as a special agent of the FBI, stated to the

10  officer that he was in pursuit of a fugitive and required local

11  law enforcement assistance.

12         Personnel and resources were provided to Mr. Smocks to

13  investigate and locate this individual.  There was some concern

14  that maybe he wasn't who he said he was, so another

15  investigation was conducted.

16         And it was determined that Mr. Smocks was in fact not an

17  FBI agent at that time nor had he ever been an FBI agent in the

18  past.

19     Q      So, again, based on information from Mr. Smocks

20  impersonating a federal agent, resources, federal resources

21  were utilized?

22     A      Yes, from the report, it indicated that two officers

23  actually helped him investigate to locate said fugitive.

24     Q      Now, in 2003, do you have any information that Mr.

25  Smocks was representing that he was a colonel in the U.S. Army?

1    A    Yes.

2    Q    And tell the Court, please, about that?

3    A    So there was an investigation that occurred between

4  2003 and 2006 that I reviewed.  Some of the information in

5  there was that in 2001, Mr. Smocks lived at an apartment

6  complex.  He failed to pay rent.  He was subsequently evicted.

7    He attended court in person and was able to convince the

8  justice of the peace in the court that he was in fact an active

9  duty military service member and that the reason why he didn't

10  pay his rent was because he was deployed with the military,

11  that he was -- identified himself at that time as a sergeant

12  and also as a military pilot.

13    He was not evicted as a result of that court proceeding.

14  Eventually, he did not end up paying his rent, so the apartment

15  complex changed his locks.

16    Several -- some time passed and then an individual came to

17  the leasing office matching the description of Mr. Smocks,

18  saying he was Mr. Smocks' brother and that Mr. Smocks had died

19  and that he would like to have access to the apartment to

20  gather his belongings as next of kin.

21    The apartment complex allowed him access to the apartment

22  for several days to collect Mr. Smocks' belongings.

23    After some time, they ended up changing the locks again.

24  Some time had passed after that.  And an individual again

25  matching the description of Mr. Smocks had broken into the

1    apartment and stole some computer equipment.

2        Shortly thereafter, that was in 2001.  In 2003, he had a

3    girlfriend who reported to the FBI that he -- Mr. Smocks had

4    shown her a DSS credential with his picture on it, which is

5    Diplomatic Security Service, and that he had told her that he

6    was on some type of top secret government team that, you know,

7    he travelled a lot for.

8        He was also identified in 2003, now instead of being a

9    sergeant, now he was a major.  He had a Army dress uniform that

10   he wore at a wedding in 2003, complete with metals that he did

11   not earn.

12       And then in 2003, he was eventually arrested.  A search

13   warrant happened at his apartment, where they recovered the

14   Army uniform with the metals.

15       They recovered the DSS credentials.  They recovered a

16   laminating/ID-type machine similar to the one that we recovered

17   on our search where he would have used that to make fraudulent

18   IDs.

19       I believe they recovered three military IDs, indicating

20   that he was a major, a fraudulent DD214, and several other

21   items.

22       Q    Okay, now the incident that you just described in

23   2003, did that make up the conviction that was out of the

24   Eastern District of Texas?

25       A    It did.  And I also need to add that they recovered

1    approximately 20 checks that Mr. Smocks had fraudulently made

2    indicating that he had gotten -- he was an employee of Home

3    Depot and that those checks were made to him from Home Depot as

4    an employee.  And it was verified through that investigation

5    that those were all fraudulent documents.

6        Q    Okay.  And I forgot the 2001 incident, but also I

7    forgot 2000, was he also charged with operating a company

8    without a license?

9        A    Yes, in 2000, he operated a company without a

10   license, was selling -- he was involved somehow with auto

11   insurance and he was taking personal information that he had

12   obtained and providing it to others to identify people's

13   locations.

14       Q    And you said you did review his -- Mr. Smocks'

15   criminal history?

16       A    I did.

17       Q    And does he have other offenses that are mostly

18   fraudulent in nature?  Forgery --

19       A    Yeah, so.

20       Q    -- bad checks?

21       A    At the age of 18, I believe it was his first charge

22   for unlawful use of a credit card.  He's got multiple other

23   convictions dealing with theft and fraud to include false

24   identification, bank fraud, theft, auto theft.  It's just a

25   litany of fraud and theft-type charges.

1   Q   Now, agent, based on your investigation of Mr. Smocks

2   and the fact that the threat came to your attention by

3   concerned individuals, the fact that you reviewed his YouTube,

4   where there was this call to arms, and you reviewed the

5   threats, his repeated pattern of impersonating law enforcement,

6   his history of fraud-related offenses, his frequent flights out

7   of the country, his foreign contacts out of the country, the

8   fact that his wife lives in another country, the fact that he

9   holds himself out as a pilot, holds himself out to be in the

10  Army, basically, living a lie, do you believe that he is a

11  danger to the community and/or a flight risk?

12  A   Given his extraordinary criminal history and pattern

13  over his entire life of pretending to be people he isn't, and

14  interact especially -- his interaction with law enforcement,

15  that his boldness in doing so, yes, to both of those questions.

16          MS. BATSON:  Okay, Your Honor, I'll pass the witness.

17          THE COURT:  Mr. Whalen?

18      (Pause)

19                      CROSS-EXAMINATION

20  BY MR. WHALEN:

21  Q   Agent, good morning.

22  A   Good morning.

23  Q   I'm -- is it okay if I just call you agent because

24  I'm going to butcher that name --

25  A   Yeah, that's fine.

1    Q    -- 2,000 times, okay, thank you.  What -- you're a

2  special agent.  What office field office are you assigned to?

3    A    The Dallas Field Office.

4    Q    Okay.  And you've been at the Dallas Field Office the

5  entire time?

6    A    Yes, that's correct.

7    Q    Okay.  So you're the -- they say you're the lead case

8  agent on the case.  So did you draft the complaint?  I know you

9  didn't sign -- did you sign the complaint or did another

10  officer sign?

11    A    The complaint was drafted out of Washington, D.C.

12    Q    Okay, and did you have input in the drafting of the

13  complaint?

14    A    I did.

15    Q    Okay, and did you review the complaint before it was

16  submitted to the magistrate?

17    A    I did not swear out the complaint, but I reviewed it

18  before I submitted or so D.C. wrote it up.  They sent it to me

19  to look over.  I looked over it and said it looked accurate to

20  me and emailed it back to Washington, D.C.

21    Q    Okay.

22    A    And they went with it from there.

23    Q    Okay, and so, the first thing I want to start with is

24  you mentioned some of the posts that he had.  How long was the

25  Parler account active?

1      A     So the Parler account was opened in November of 2020.

2  And I'm not -- I don't recall the exact date that it was shut

3  down off the Internet.

4      Q     Okay, and you would agree with me that at some point,

5  Parler got shut down, correct?

6      A     That's correct.

7      Q     Okay.  And in the course of your investigation prior

8  to Parler being shut down, did you look at all the posts that

9  you attribute to Mr. Smocks?

10      A     So I was only able to see posts that were reported by

11  the myriad of reports we were getting concerning violent posts

12  that was made by Mr. Smocks.

13      So I did not -- we haven't gotten the returns back from

14  them yet, so I've not seen every single post that has been

15  posted on his Parler account, no.

16      Q     Okay.

17      A     Just the ones that reported to us as being of

18  concern.

19      Q     Okay.  And have you -- so just so I'm clear, you

20  haven't gotten a return back from Parler yet?

21      A     Not for content, no.

22      Q     But as far as the so-called tips that you got, those

23  related to the post that you cited in the complaint, correct?

24      A     Yes, sir, correct.

25      Q     Okay.  Now would you agree with me that the parts of

1    what you put in what's in the complaint, those are not the

2    complete posts, would you agree with that?

3         A    I believe in the complaint they did not write up the

4    entire post.  One of the drafts had screenshots, but I believe

5    the final one took those screenshots out.

6         Q    Okay, and whose decision -- and did the screenshots

7    have the entire post?

8         A    They did.

9         Q    Okay.  And whose decision was it to take out the

10   screenshots out of the affidavit for the complaint?

11        A    I don't know.

12        Q    Okay.

13        A    They were not mine.

14        Q    Okay.

15             MR. WHALEN:  Your Honor, at this time, I want to

16   offer Defendant's Exhibit 1 and 2.

17             THE COURT:  Ms. Batson, have you had an opportunity

18   to review those exhibits?

19             MS. BATSON:  Yes, Your Honor.  These are two of the

20   threats.  We had no objection, but there was a third posting as

21   well that Agent Chumak testified about.  So these -- this is

22   not a complete posting of the ones that caused concern.

23             THE COURT:  So are you invoking optional completeness

24   and asking the Court also consider the third post?

25             MS. BATSON:  Yes, Your Honor, the testimony about the

1   third post.

2            THE COURT:  All right.  You -- they shall be admitted

3   then.

4        (Defendant's Exhibits 1 and 2 admitted into evidence)

5            MR. WHALEN:  Okay, thank you, Your Honor.  And is it

6   okay since I generally don't know how to work that thing, that

7   Mr. Sandel does it for me?  Okay.

8            THE COURT:  Absolutely.

9            MR. WHALEN:  All right.  Thank you.

10            1, please.

11   BY MR. WHALEN:

12        Q    Okay, agent, we have what's been marked as

13   Defendant's Exhibit 1.  Would you agree with me that

14   was -- that is one of the posts that you're referring to; is

15   that correct?

16        A    Yes, that's correct.

17        Q    Okay, and you would agree with me that the entire

18   post was not included in the complaint, correct?

19        A    I don't believe the entire post was included, no.

20        Q    Okay, and would you agree with me that how things are

21   interpreted, you have to put them in context, would you agree

22   with that?

23        A    Sure.

24        Q    Okay, and would you agree with me that words before

25   and words after are important?

1    A    Yeah, I would agree with that.

2    Q    So, when you look at this post, would you agree with

3    me that there's a statement in there that says but if we must,

4    correct?

5    A    Yes, but is misspelled as bit, bit if we must, but I

6    believe that word was supposed to be but, uh-huh.

7    Q    Okay, and so, and the first part says that they came

8    to -- I'll read it verbatim.  Today, January 6, 2021, we

9    patriots by the millions have arrived in Washington, D.C.

10   carrying banners of support for the great President the

11   world -- for the greatest President the world has ever known.

12   But if we must, we'll return on the 19th.  And the remainder of

13   the post is there, correct?

14   A    Yes.

15   Q    Okay, now if we can look at Defendant's Exhibit 2,

16   would you agree with me that what's been marked as Defendant's

17   Exhibit Number 2 is the entire post that you're referencing as

18   that you consider to be a threat?

19   A    Yes, that is the entire post.

20   Q    Okay.  And so, that if I could for the record, read

21   the first part.  It says to -- and would you agree with me that

22   the first full paragraph is not included in the complaint?

23   A    I would need to review it to --

24   Q    Okay.

25   A    -- accurately answer that question.

1          MR. WHALEN:  Excuse the notes on it, but if could,

2     Your Honor, may I approach him real quick, so he can look at

3     the complaint?  Thank you.

4          THE WITNESS:  Yes, in the complaint, it starts with

5     the paragraph that states so over the next 24 hours and the

6     first paragraph does not include it in the complaint.

7     BY MR. WHALEN:

8          Q    And so, was it your decision as a case agent not to

9     include that paragraph?

10         A    No, it was not.

11         Q    Okay, whose decision was it?

12         A    I assume somebody up in Washington, D.C. area.

13         Q    Okay, but you eventually -- they eventually sent it

14    to you and you said you were okay with it, correct?

15         A    I reviewed it.

16         Q    Okay, did you say you were okay with it?

17         A    I said it was -- looked -- I think my exact words in

18    the email were it looks good to me.

19         Q    Okay.  And so, if I just read that out loud, it says

20    to me today Eric Trump said that he would physically fight with

21    the patriots to save our country.  Today, Representative Mo

22    Brooks asked the patriots to pledge our live (sic) and wealth

23    to fight for our country.

24         And today, President Trump told us to fight like hell.  He

25    said that our case was a matter of national security and that

1    these people behind the massive fraud must be arrested and

2    brought to justice and that task falls on the shoulders of we

3    the people, the American patriots.  Is that what it says?

4         A    That's what it says.

5         Q    Okay.  And is it fair to say that what he meant by

6    going to fight or hunt these cowards down was to arrest them

7    and bring them to justice?  Would that be a fair interpretation

8    of what that post says?

9         A    I don't see any indication of that in what he wrote,

10   no.

11        Q    Okay.

12        A    Based on our interview, I don't -- would disagree

13   with that statement.

14        Q    Well, based on your interview, what about his

15   interview that says you disagree with that interpretation?

16        A    So, I think that, first of all, where it says prepare

17   weapons, prepare weapons and then go get them.  Let's hunt

18   these cowards down like the traitors that each of them are.

19        I would say that's pretty clear that weapons would imply

20   firearms.  And anyone who speaks the English language, Mr.

21   Smocks including being an author chooses his words pretty

22   specifically because he writes books and people pay him for

23   exchange of his thoughts on paper.

24        The word hunt, I don't know if you're a hunter, but I

25   don't know anyone who doesn't hunt with a firearm for the

1    purpose of killing an animal in order to eat it.

2        So hunt those traitors down to me as a college graduate, I

3    would interpret that as hunting with a gun, especially when it

4    says weapons right in front of it.

5        And additionally, the last statement that says it wasn't

6    the building we wanted.  It was them.

7        Q    Okay.  Well, have you -- we hear the word hunt in law

8    enforcement they say they're on a manhunt.  Does that mean

9    you're going to go kill somebody?

10       A    No, it does not.

11       Q    Okay.  And so, just because you think that's what it

12   says, that doesn't necessarily mean what it means, correct?  To

13   --

14       A    Mr. Smocks was not a -- even though he's posed

15   himself several times as a law enforcement officer is not a law

16   enforcement officer, so I don't think he could be using the

17   same way.

18       Q    Would you agree with me that two people could look at

19   that and come to a different conclusion?

20       A    Yes.

21       Q    And as far as the -- it talks about RINOs, Dems, and

22   tech execs, do you see that?

23       A    Yes, I do.

24       Q    Okay, and would you agree with me that those are the

25   people that President Trump was referring to behind the massive

1  fraud that should be arrested?

2      A    Could you ask that question again?

3      Q    Well, are the people behind the massive fraud that

4  President Trump referred to are the RINOs, the Dems, and the

5  tech execs?

6      A    I'm not familiar with who specifically the President

7  identified as being behind the fraud.

8      Q    So would you agree with me that it's vague?

9      A    I'm sorry?

10     Q    Would you agree with me that then it's vague on who

11 he's referring to?

12     A    So I would interpret RINOs as Republicans just in

13 general, Dems as Democrats just in general, and tech execs of,

14 you know, CEOs and CFOs of tech, you know, tech companies

15 perhaps like Twitter, Facebook, social media, that kind of

16 stuff.

17     Q    Okay, just general categories of people?

18     A    He doesn't specifically mention a specific

19 Republican, or a specific Democrat, or a specific tech

20 executive, no.

21     Q    Or a specific person?

22     A    No.

23     Q    Okay.  And when you said you got numerous complaints

24 or tips or whatever, how many total?

25     A    Greater than 10 from multiple states around the

1    country.

2        Q    Okay, great than 10, less than 20, greater than 10,

3    less than 15?

4        A    So I have -- because I was working on this case and

5    others, I haven't had a chance to review all of them, but I

6    know that I had gotten a couple of emails even as recent as a

7    few days ago with other tips that were trickling in.

8        So the ones that I viewed between January 6th and January

9    9, I would say, are greater than 10 and less than 20.  However,

10   there may be more that I'm not aware of.

11       Q    Okay.  And in the course of your investigation, did

12   you come to conclude that he never entered the Capitol

13   premises?

14       A    According to what he had stated, he did not enter the

15   Capitol building itself.  The investigation's still ongoing, so

16   I don't have irrefutable proof that he was not in the building

17   other than his statement.

18       Q    And then also in the complaint, there were certain

19   words that were emphasized.  Did you make that decision to

20   emphasize them or italicize them or was it somebody else?

21       A    I did not.  That was Washington, D.C.

22       Q    Okay.  And who specifically did you deal with in

23   Washington D.C.?  When you say Washington D.C., I mean, who did

24   you talk to or who made those decisions?

25       A    Individuals associated with the Federal Bureau of

1    Investigation and the Department of Justice.

2         Q    And you had a chance to -- you talked about his

3    flight records and that he cancelled it the night before.  Did

4    you ever reach out to any of his family members to confirm

5    whether or not they were coming to town?

6         A    No.

7         Q    Okay.  And then, you executed this -- let me ask you

8    this too before I forget.  On the lease that you talked about

9    where he put on the leasing application certain information

10   that you -- that he admitted was false, what year was that

11   lease application?

12        A    I don't recall.

13        Q    Okay.  Was it done within the last year or five

14   years?  How long had he been living at that location?

15        A    I don't recall.

16        Q    Okay.

17        A    I'd have to look at the application and review it to

18   refresh my memory.

19        Q    Okay, so it could be -- could have been several years

20   ago when he filled out that application?

21        A    Could have been, uh-huh.

22        Q    And you also mentioned that in the course of the

23   interview, he denied intending or his intent was to threaten

24   anyone; is that correct?

25        A    Yes, he did state that in the interview.

1      Q    Okay.  But also in the course of that interview, he

2   also admitted, too, that certain documents were fraudulent and

3   had made admissions about the pilot, and he created that,

4   correct?

5      A    Yes, he did.

6      Q    Okay.  Would you agree with me that during the course

7   of the interview based on your testimony, that he made a lot of

8   admissions of past criminal conduct?

9      A    At that time, I wasn't fully aware of his criminal

10   history.  So --

11      Q    Well, you asked him about the cards and the NetJets

12   things, correct?

13      A    I did, because those are things that were found

14   during the course of this investigation.

15      Q    And you asked him whether or not they were

16   fraudulent, correct?

17      A    I did.

18      Q    And he admitted they were?

19      A    He did.

20      Q    And so, during the course of this, he made many

21   admissions to you that he had held himself as somebody else or,

22   you know, fraudulent nature or had fraudulent documents and

23   created them, correct?

24      A    Yeah.

25      Q    Okay, would you -- and did he know -- did you

1    confront him with that or did -- how did the interview go when

2    you asked him those questions?

3        A    When I asked him -- I asked him specifically about

4    the -- I was asking him about his source of income.  And he had

5    stated that his only source of income were from the biohazard

6    cleanup company 74D and then as being an author.

7        We went into wiring -- I asked him if what he told other

8    people -- I was basically trying to find out, I asked him,

9    like, you know what do you put on official documents when

10   you're applying for apartments or rental cars or anything else

11   like that, what do you portray yourself to other people as

12   being?

13       And he said I don't want to talk about it.  Then, so I

14   asked have you ever told anyone that you were a pilot?  And he

15   goes, yes.

16       Q    Okay.

17       A    And that's when it got (indiscernible).  I said have

18   you ever -- do you have an FAA pilot certificate?  And he said

19   no.  I was like have you ever made one up?  And he said yes.

20       I said have you ever worked for NetJets?  He goes no.  I

21   was like do you have -- he's like -- why do I have a NetJets ID

22   that has your picture and name on it?  And he admitted to

23   making that up as well.

24       Q    Now you also talk about that he wired money to

25   friends in different countries, correct?

1        A    Yes.

2        Q    Okay, prior to being interviewed, did you have that

3   information to know that to be true that he had wired money?

4        A    I did.

5        Q    Okay.  And when he -- when you asked him about it, he

6   admitted that he had wired money, correct?

7        A    He admitted to a few of the total wire transfers that

8   we were aware of.

9        Q    Let's talk about the search warrant.  You indicated

10   that you said you found a revolver; is that correct?

11        A    Yes.

12        Q    Okay, and if you could, the revolver was mounted on a

13   plaque or a piece of wood or something like that?

14        A    That's my understanding.

15        Q    Okay, were you present for the search?

16        A    I was not.  I was interviewing Mr. Smocks at the

17   time.

18        Q    Okay.  Were pictures taken of the search?

19        A    Yes.

20        Q    Okay, did you see a picture of the revolver?

21        A    I have not.

22        Q    Okay, was it described to you as a revolver that was

23   mounted on a plaque like a piece of memorabilia?

24        A    It was described to me as a revolver.

25        Q    Okay, but you did learn later it's mounted on a piece

1   of wood?

2        A    That's correct.

3        Q    Okay.  Looks like a piece of memorabilia or could?

4        A    Again, I haven't seen it.

5        Q    Okay, and as far as you sit here today, you have no

6   evidence or no knowledge whether or not the thing's even

7   operating, correct?

8        A    We have not -- we have not tested that yet, no.

9        Q    Okay, but it looked more like a -- would you say

10  based on the description given to you, that it was more of a

11  piece of art to hang on the wall or put on a desk than it is

12  anything else?

13       A    Mr. Whalen, again, I haven't seen it.

14       Q    Okay, okay, you haven't seen it, but you're

15  testifying that a revolver was found, right?

16       A    That's what was the written on the evidence

17  collection log, yes.

18       Q    Okay, and my assumption is that you're going to say

19  or the Government's going to get up and say, well, he had a

20  revolver so he's a danger to the community, correct?

21       A    I think we're citing other reasons why he's a danger

22  to the community than the revolver that was found in his

23  apartment.

24       Q    Okay, so the revolver doesn't factor in the equation,

25  is that what you're saying?

1    A    That would be a legal question for the Government.

2    Q    Did you find any zip ties or anything like that or

3  handcuffs in the search of the house?

4    A    I did not see zip ties or handcuffs listed in the

5  evidence collection log, no.

6    Q    Okay, and were there -- I think on the list, there's

7  potentially knives found?

8    A    I believe there were two knives and a stun gun.

9    Q    Okay, and tell me what the knives look like?

10    A    I have not seen those.

11    Q    But you did verify with American Airlines that he had

12  booked a ticket on the 15th and was coming on the 24th?

13    A    Yes.

14    Q    Okay, and as far as you conducted surveillance of his

15  apartment, correct?

16    A    I did not personally, but the FBI did, yes.

17    Q    Okay, and when did that surveillance come?

18    A    I would have to go back and look.  I know that he

19  was -- the day that he was identified walking out of the

20  apartment, I think was on the 13th, January 13th, 2021.

21    Q    Okay.  Did you -- when you entered the apartment, or

22  during the search, did -- was there anything observed such as

23  luggage packs or anything like that that he was prepared to

24  leave or go anywhere?

25    A    I don't know because I was interviewing him at the

1   time that the evidence response team was executing the search

2   on his house.

3          Q     Okay.

4          A     Or apartment, excuse me.

5          Q     Would it be fair to say that if something like that

6   was observed by another agent, they would have brought it to

7   your attention?

8          A     Potentially.

9          Q     Like if he's packed up and ready to go somewhere,

10  that would be important?

11         A     Because I know I often pack on the morning of my

12  travel even if it was an early morning flight, sometimes

13  because I had other stuff going on.  So I'm not sure how that's

14  relevant.

15         Q     Well, come on.

16         A     People pack at different times.

17         Q     Right, but let's be honest.  I mean, if he had a

18  piece of luggage packed and ready to go, he'd be sitting here

19  saying he was packed up ready to leave and he's a flight risk.

20  That's why I'm asking the question.

21         A     Okay, so as far as I'm aware, he did not have a

22  packed bag --

23         Q     Okay.

24         A     -- that was listed in the evidence collection log.

25         Q     Okay, and you found his passport, correct?

1      A     Yes, we recovered his passport.

2      Q     And in the course of searching his house, you found

3  certain documents, but did you find any fraudulent travel

4  documents or passports or anything -- any foreign travel

5  documents of any kind?

6      A     I believe all the fraudulent documents that were

7  recovered did not have anything to do with travel, no.

8      Q     Have you talked to anybody at NetJets?

9      A     I have not.

10     Q     Okay.  Do you have any evidence to show that he

11 attempted to go to NetJets, and board a plane, or do anything

12 like that?

13     A     Not at this time, no.

14     Q     And as far as part of your investigation, did

15 you -- in order to find his international -- find his travel,

16 did you reach out to Border Patrol to get his history of

17 international travel or domestic travel?

18     A     We obtained that information during the course of the

19 investigation, but we did not specifically -- I did not

20 personally specifically reach out to someone from Border Patrol

21 for that, no.

22     Q     Okay.

23     A     We have other methods of getting that information.

24     Q     Okay, and on all the times that he travelled, he came

25 back to the United States, correct?

1      A     Yes.

2      Q     And was there discussion about his wife trying to get

3   a visa to come to the United States?

4      A     No, he never talked about that during the interview.

5      Q     All right.  And when was the -- when did you execute

6   the arrest warrant?

7      A     On the morning of January 15th, 2021.

8      Q     Okay, and did you knock on the door and he came to

9   the door what's your understanding -- were you present when the

10  arrest was made?

11     A     Yes, I was.

12     Q     Okay, and did you knock on the door and he came?  Can

13  you describe to me the interaction with Mr. Smocks on the day

14  he was arrested?

15     A     So other agents arrested him.  As a case agent, I was

16  waiting in a car.  Once he was in custody, myself and others

17  and approached him, switched out their handcuffs with my

18  handcuffs, and then we transported him to the FBI Office.

19     Q     Okay.  And was there any issue with arresting him or

20  anything like that?

21     A     Not to my knowledge.

22     Q     You had mentioned earlier in your direct examination

23  that just because some -- just because somebody buy tickets,

24  you'll never assume they're going to take a trip, correct?

25     A     Yeah, that is what I stated.

1    Q    Okay, and so, since he didn't have any tickets to go

2  to D.C. on the 19th, right?

3    A    No, he did not.

4    Q    Okay, so is it reasonable to assume that he wasn't

5  going to D.C.?

6    A    So, I'm aware that given the media surrounding this,

7  a lot of people were intending to drive.  So he could have got

8  there multiple different ways.  I don't know.

9    Q    Okay, so but that's an assumption, too?

10    A    It would be, yes.

11    Q    Okay.  Now as far as the YouTube video goes, that

12  wasn't part of the complaint, correct?  I mean, you mentioned

13  that, but is that -- you're not saying that's a threat, right?

14    A    It was not listed in the complaint.  That was

15  something that was discovered during the course of the

16  investigation.

17      So all of the concerned citizens that were contacting the

18  FBI regarding threats made by Mr. Smocks, they were all based

19  on posts made on Parler, not the YouTube account.

20    Q    Okay.

21    A    That was something that we found during the course of

22  the investigation.

23    Q    Okay, and just to touch on the YouTube video briefly,

24  is it really what Mr. Smocks was saying in the YouTube video

25  was that if you people show up with these guns, you need to

1    stop it because you don't know really what you're getting

2    yourself into?

3        A    I would need to review the video, but that was not

4    my -- that wasn't what I -- when I watched it afterwards,

5    that's not what my takeaway was.

6        Q    Okay.

7        A    But I would need to review it again to accurately

8    answer that question.

9        Q    Okay, and would you agree with me that different

10    people could review it and have a different takeaway on it

11    based on --

12        A    Yeah, that absolutely is possible, yeah.

13        Q    Okay.  And in the course of your investigation, maybe

14    I've asked this already, but let me ask it a different way, as

15    far as all his travel, all the investigation done as far as

16    travel, do you have any indication that he ever travelled

17    outside the United States or even within the United States

18    under a different name other than Troy Smocks?

19        A    I wouldn't know that information because everything

20    that we ran was under the name Troy Smocks.

21        Q    But you're aware of some aliases there were some --

22        A    I am.

23        Q    Okay, did you run any of the aliases and see --

24        A    No, it has not been done yet.

25        Q    Okay.

1      A    I am aware that he did attempt to get a Texas

2   driver's license using a fraudulent DD214, using the name Troy

3   Perez that was rejected.

4      Q    Okay, and what year was that?

5      A    I don't recall.

6      Q    Okay, was that listed in his criminal history on his

7   Pre-trial Report?

8      A    That was within the context of the FBI investigation

9   that occurred between 2003 and 2006.

10     Q    Okay.  And would you agree with me that based on his

11  criminal history, his last conviction was from 2005?

12     A    I'm sorry, what year?

13     Q    Is 2005?

14     A    I would have to review his criminal history, but that

15  sounds accurate.

16     Q    Okay, in or around 2005, would you say would be fair?

17     A    Yes, that be fair to say.

18          MR. WHALEN:  I'll pass the witness, Your Honor.

19          THE COURT:  Ms. Batson, any further questions for

20  your witness?

21          MS. BATSON:  Yes, Your Honor.  Just a few follow up.

22      (Pause)

23                        REDIRECT EXAMINATION

24  BY MS. BATSON:

25     Q    Now, Agent Chumak, in this particular posting, it

1    shows that it's Colonel T. Perez, Retired like you testified

2    about, correct?

3         A    Yes.

4         Q    Okay, and in this one, it says We patriots arrived?

5    And he says we, capital W?

6         A    Yes, he does.  We and us is used in the post, yes.

7         Q    Okay, and then, again, he capitalizes the W in we on

8    the second line, bit if We must?

9         A    Yes, that's correct.

10        Q    Okay, and then it says many of Us, capitalize the

11   "U", will return on January 19, carrying our weapons, right?

12        A    Yes, it does.

13        Q    And our nation's resolve?

14        A    That is right.

15        Q    Okay, any time he's saying we, our, he's including

16   himself as the millions of patriots who responded and will

17   respond?

18        A    That's how I would interpret that, yes.

19        Q    Okay, now Mr. Whalen asked you about the fact that

20   you testified about the travel to the Dominican based on your

21   training and experience might not have happened and he could

22   have gotten there another way?

23        A    Sure, that's possible.

24        Q    Okay, now based on his own posting, it appears that

25   he does intend to go back?

1      A      So the preface of, you know, but if we must, many of

2  us will return.  I mean, he doesn't say many of us may return,

3  many of us are thinking about returning.

4      He uses the word will, which I think in the English

5  language implies definitively that he would be will as opposed

6  to maybe.

7      Q      Okay, and again, the next sentence is we will come in

8  numbers --

9      A      Yes, again he's --

10     Q      -- and no standing Army?

11     A      Again, he uses the will implying that it will occur,

12 not that it may occur.

13     Q      Okay.  And then, Mr. Whalen asked you about this

14 particular post.  And I think this -- where it says hunt, oh,

15 in the second paragraph, it starts so over the next 24

16 hours --

17     A      Uh-huh.

18     Q      -- let's hunt these cowards down?

19     A      Yes.

20     Q      But he didn't say manhunt, correct?

21     A      No, he did not.  Additionally, he used the term get

22 our personal affairs in order, which based on my training and

23 experience, when somebody says something like that in some kind

24 of document or a letter, it means to -- it means that they're

25 going to do something that they're not planning on coming back

1    alive from.

2         So getting all -- you know, making a will, making sure

3    money's transferred where it needs to be, making sure all of

4    your personal affairs in order because you may not be coming

5    from wherever it is you're going, whatever it is you're

6    planning to do.

7         Q    And that's what he says?

8         A    He says let's get our personal affairs in order,

9    prepare our weapons, and then go get them, let's hunt these

10   cowards down like the traitors like each of them are.

11        Q    Okay.  And again, prepare our weapons.  Would you say

12   that that's a call to be ready, to arm up?

13        A    Yes, I -- during the interview, I read Mr. Smocks the

14   definition of the word weapon in dictionary.com and he refused

15   to agree that in his world that he has a different definition

16   of it compared to the rest of society.

17        Q    And did he say what that definition was?

18        A    He claimed during the interview that his use of the

19   word weapons was to imply not firearms, but computers, cell

20   phones, and minds.

21        Q    And what?

22        A    Minds, your mind.

23        Q    Oh, mind, oh, okay.

24        A    Yes, uh-huh.

25        Q    So that's what he said he meant by the word weapon?

1    A    That's what he said what he meant by the word weapon,

2    that's correct.

3    Q    Means somebody who claims to be in the Army, this is

4    what he --

5    A    That's what he said.

6    Q    -- the definition he came up with?

7    A    Yes.

8    Q    Okay, and then when he says this includes Dems or

9    wait, RINOs, what does that mean?

10   A    I would interpret that as like Republicans, I forget

11   what the term specifically is a short for.

12   Q    Okay, Dems and tech execs?

13   A    Uh-huh.

14   Q    Does he anywhere in this post mention the Chinese,

15   being at war with the Chinese?

16   A    He does not, but during the interview, again, he

17   tried to make us believe that this was in reference to

18   the -- some kind of Chinese insurrection or violent takeover of

19   the country.

20   Q    Okay.  And it says we have the green light, basically

21   those who resist us are enemies and must be treated as such.

22   Now when you read the words must be treated as such, enemies

23   must be treated as such, what do you take that to mean?

24   A    So during our discussion with him, his interpretation

25   of what a traitor is and what historically speaking would

1    happen to somebody who betrayed their country.

2         And he seemed, again in his world, seemed to disagree that

3    typically traitors are -- traitors of a country are typically

4    punished by death.

5         And he argued that a traitor would be simply arrested and

6    tried by the justice system by whatever the justice system

7    determined was applicable punishment.

8         Q    Okay, and then, when he says we took the Capitol, and

9    they only have it because we left, it was them that they

10   wanted.  Did you all discuss that in the interview?

11        A    We did.  He was very ambiguous.  During parts of the

12   interview, he stated that he supported what happened with the

13   takeover of the Capitol.

14        And then, at other parts of the interview, he kind of

15   backtracked that and said that he didn't support the breaking

16   in of the Capitol.  He was there just supporting the people who

17   were peacefully protesting.

18        So he kind of was -- went back and forth with that.  It

19   was very hard to get clarity for him because he was being very

20   evasive to the questions.

21        Q    Okay.  Now Mr. Whalen asked you about filling -- when

22   he filled out the application?

23        A    Yes.

24        Q    And you haven't actually reviewed the date?

25        A    I have seen an electronic copy of the application.

1    I've not actually seen the physical copy from the legal return

2    that was submitted to Preston Heights Apartment.

3        Q    Okay, but even though you don't remember the name or

4    didn't see the date, but you did review the information and

5    determine that a lot of the information on there was false?

6        A    I did.

7        Q    Now just to be clear, Mr. Smocks lived at one

8    particular apartment in this complex and then moved to another?

9        A    He did.  So that was a little bit confusing for us as

10   well.  Initially when he moved into that apartment, he was in

11   Apartment 5A.

12       And at some point, again, I do not recall the specific

13   date.  I want to say it was August, but I don't remember the

14   specific year without reviewing it, he moved into Apartment

15   20A.

16       There was also some ambiguity with the address on his

17   driver's license, as well as which address the vehicles were

18   registered to.

19       If I recall correctly, I think one of the vehicles

20   registered to 20A, one of them list at 5A, so there was

21   some -- that's why it was really important that we see him

22   coming out of 20A prior to executing the search warrant to make

23   sure we had the right apartment.

24       Q    Okay.  Now Mr. Whalen asked you about the revolver

25   that was listed on the seizure?

1    A    Yes.

2    Q    The items in the search warrant?

3    A    Yes.

4    Q    Now, again, there's been no testing of that firearm

5  to make sure it functions as intended as a weapon to expel

6  projectile?

7    A    That has not, but I would like to point out that he

8  has, as we talked about before, during some of his

9  impersonations of federal law enforcement, he has been seen

10  with a firearm, whether it was useful or not, I think part of

11  it also has to do with perception by the public.

12    Q    Okay.  But he did have a stun gun?

13    A    He did.

14    Q    Okay.  And did you see the stun gun by any chance?

15    A    I did not.  During the interview, I asked him if he

16  thought that a stun gun was a weapon.  And he said that he

17  didn't consider it a weapon.  He considered it a personal

18  protective device I believe is what he said.

19    Q    Okay, and then also, there was the printing machine

20  that was found?

21    A    There was.

22    Q    In the search warrant?  And was there also the -- a

23  false ID representing himself as a colonel?

24    A    There was.

25    Q    And did he indicate to you when that particular ID

1    was made?

2         A    No, he just -- I think his response was some years

3    ago.  And he did point out that the picture of himself in that,

4    he was much younger than he currently is because now he has

5    gray hair and in the picture there wasn't as much gray hair.

6         Q    Okay, and did you discuss with him any recent

7    activity that he was involved in fraudulent documents?

8         A    We attempted to ask him if he had -- like when was

9    the last time he portrayed himself falsely or anything like

10   that?  He chose not to answer those questions.

11              MS. BATSON:  Okay.  I'll pass the witness, Your

12   Honor.

13              THE COURT:  Mr. Whalen, sir, anything further?

14              MR. WHALEN:  Just briefly, Your Honor.

15                        RECROSS-EXAMINATION

16   BY MR. WHALEN:

17        Q    Would you agree with me that prior to many of us will

18   return, prior to that, he says but if we must?  So would it be

19   fair to say that something conditional or something precedent

20   may have to happen before they return?

21        A    Yes, I would interpret that as having some orders

22   from the President, which he stated that he would follow

23   illegal orders by the President.

24        Q    Okay, so it was conditional on orders from the

25   President is the way --

1        A    I would interpret it that way, yes.

2        Q    It could be a way to interpret it?

3        A    Sure.

4        Q    And would you agree with me that those orders were

5    never going to come from the President?

6        A    I think it's hard for me to answer for the President

7    of the United States, so I don't know.

8        Q    Okay.  And then, a lot of the -- you talked about it

9    says we and us and things like that.  Would you agree with me,

10   there's always the proverbial we and you can be talking about

11   yourself?

12       A    Usually if I'm talking about myself in a group, I

13   would say we or I.  Proverbial, I don't think I understand the

14   specifics of your question.

15       Q    Okay.  Well, here's the specifics.  There's a lot of

16   times that I find myself going, hey, we're going to go to lunch

17   today.  And some people ask, well, who are you talking about?

18   I go it's proverbial, me, myself, and I.  You ever heard that?

19       A    Okay, sure, yeah.

20       Q    So we can also mean singular, not just a whole group

21   of people.  Is that possible?

22       A    I guess it's possible.  I don't understand why you

23   wouldn't say I'm going to lunch.  We implies more than one

24   person.

25       Q    Okay.  And also, we talked about weapons and you said

1   he talked about what his response to that is.  And have you

2   ever looked at it, you know, did he talk about the power of the

3   pen?

4        A    Uh-huh.  I've heard that before.

5        Q    Right, and the pen could be a weapon in its ability

6   to the words it writes and things like that, correct?

7        A    Yes.

8        Q    And just like a sign or speech can be a weapon

9   because that can be used to educate or talk to people, correct?

10       A    Sure.

11       Q    Okay, so it doesn't necessarily always mean it's a

12   firearm or something that's going to injure somebody

13   physically, correct?

14       A    True.

15            MR. WHALEN:  Okay, I'll pass the witness.

16            THE COURT:  Thank you.

17            MS. BATSON:  No questions.

18            THE COURT:  Sir, I have a few questions.  We haven't

19   talked a lot about what Parler is.  Are you familiar with

20   Parler and are you able to tell the Court what Parler is?

21            THE WITNESS:  I am.

22            THE COURT:  Okay.

23            THE WITNESS:  So my understanding of Parler is it is

24   basically a social media platform, similar to Twitter, that was

25   started kind of in response to some of the First Amendment

1    discussions regarding Twitter censoring people from saying

2    certain things.

3            It was supposed to be a platform that was supposed to

4    be more open to First Amendment to let people say whatever it

5    is that they wanted.

6            I believe it started recently and then there was some

7    controversy with what people were posting on there, which is

8    why it got shut down.

9            THE COURT:  And is it -- remained shut down or is it

10   back in operation (indiscernible)?

11           THE WITNESS:  So I have seen reports that it is back

12   up.  However, if you -- I personally checked it both on a

13   cellular device and on a computer and have not seen any actual

14   like legitimate posts, other than a screen that basically says

15   that, hey, we're back up and running but we're still working on

16   it kind of thing.  So I think at this point, it would be

17   ambiguous for me to answer that.

18           THE COURT:  All right, in light of the fact that I

19   asked the agent to clarify his understanding of what Parler is,

20   Ms. Batson, do you have any further questions?

21           MS. BATSON:  No, Your Honor.

22           THE COURT:  Mr. Whalen?

23           MR. WHALEN:  No, Your Honor.

24           THE COURT:  All right, thank you, sir you may step

25   down.

1          THE WITNESS:  Thank you.

2       (Witness is excused)

3          THE COURT:  And Mr. Whalen, can I ask if you can

4    please bring those exhibits forward?

5          MR. WHALEN:  Okay.

6          THE COURT:  I want to make sure that they --

7          MR. WHALEN:  Absolutely.

8          THE COURT:  -- don't get lost in the shuffle and that

9    the Court maintains custody of those.

10          Ms. Batson, do you have any further witnesses to

11    present or evidence to proffer to the Court as this time?

12          MS. BATSON:  No, Your Honor.

13          THE COURT:  Mr. Whalen, do you have any witnesses to

14    present?

15          MR. WHALEN:  No witnesses, just some evidence by

16    proffer, Your Honor.

17          THE COURT:  All right, have you made the proffer

18    available to Ms. Batson for her review?

19          MR. WHALEN:  I have not.  It would just simply be an

20    oral proffer, but I'll talk to her about it.

21          THE COURT:  If you wouldn't mind doing that so we can

22    ascertain whether they'll be any objections.

23       (Counsel confer)

24          THE COURT:  Mr. Whalen, have you and Mr.

25    Batson -- Ms. Batson have a sufficient opportunity to discuss

1    your proposed proffer?

2              MR. WHALEN:  We have, Your Honor.

3              THE COURT:  All right, and at this time, Ms. Batson,

4    are there any objections to Mr. Whalen's proposed proffer?

5              MS. BATSON:  Your Honor, as I indicated, Mr. Whalen,

6    I don't oppose his presentation to the Court of the facts.

7    However, it's my understanding he's going to ask for a certain

8    person to be a third-party custodian, and I am objecting to

9    that because she has not been interviewed by Probation.

10             She's not here to testify, to be questioned by us and

11   also by the Court.  And so, we would object that portion.

12             THE COURT:  All right.

13             Mr. Whalen, I'll hear from you at this time, sir.

14             MR. WHALEN:  Your Honor, we would proffer that if Mr.

15   Smocks' niece Latoya Turner (phonetic) was called to testify,

16   she would indicate that she is planning to move to Dallas and

17   was present in Dallas on January 15th.

18             And that's why he cancelled his trip to go to the

19   Dominican Republic, so that would be -- and they were coming

20   down to look at houses and he was going to help them do that.

21             Also, if she was called to testify, she has

22   volunteered and said she'd be willing to be a third-party

23   custodian and stay with him at his apartment here in Dallas if

24   so ordered.  And that's the extent of the proffer, Your Honor.

25             THE COURT:  Thank you, Mr. Whalen.  Mr. Whalen, I

1    have an inquiry as it relates to the firearm there was a

2    significant amount of discussion about whether or not it was

3    mounted, was workable.  And it appears that at this juncture,

4    no parties are able to represent that.

5           Do you know, sir, or are you arguing that it is not

6    in fact a firearm?

7           MR. WHALEN:  I am.

8           THE COURT:  Okay.

9           MR. WHALEN:  Based on my limited understanding.

10          THE COURT:  If it does qualify as a firearm, are you

11   able to tell me, is your client permitted to be in possession

12   of one?

13          MR. WHALEN:  Well, I think it would be an unfair

14   question for me to answer, Your Honor.

15          THE COURT:  Based on his criminal history, are you

16   able to offer an opinion as to whether or not he's permitted

17   legally to be in possession of a firearm?

18          MR. WHALEN:  If the assumption is he's a

19   convicted -- any person who's a convicted felon is not allowed

20   to possess a firearm.

21          THE COURT:  Thank you, Mr. Whalen.

22          All right, at this time, then, there being no further

23   proffers or evidence to present to the Court, and because this

24   is not a presumption case, Ms. Batson, I'll hear from the

25   Government first.

1        MS. BATSON:  Yes, Your Honor.  I would like to

2    address some matters in the Pre-trial Services Report

3    before --

4        THE COURT:  And let me do remind both of you again,

5    we've run the preliminary and detention hearing together.  And

6    so, in argument, I would expect and hope that each of you will

7    address not only the detention issue, which is clearly the most

8    prevalent on everyone's mind, but the issue of the preliminary

9    hearing as well.

10        MS. BATSON:  And I will mention that Pre-trial

11    Services Report as it relates to the detention portion, Your

12    Honor.

13        THE COURT:  Thank you.

14        MS. BATSON:  So, Your Honor, you've heard the

15    testimony of FBI Agent Kendrick Chumak.  And he indicated to

16    you that he was the primary case agent on this case and that

17    his investigation of Mr. Smocks showed a pattern of Mr. Smocks'

18    fraudulent life.

19        And in that, and he impersonated several law

20    enforcement officers, including Secret Service, FBI, DEA, just

21    the gamut of federal agencies.

22        And, Your Honor, he was previously convicted in the

23    Eastern District for similar conduct of the fraudulent nature

24    of possessing several fraudulent documents, again, of holding

25    himself out to be someone who he's not.

1        And we know that now.  We know that he was doing that

2   as a pilot.  He's consistently done the exact same thing that

3   he was convicted of in prison several times before, both state

4   and federally.  And he continues to engage in the same conduct.

5        As far as the complaint for which he is for now, Your

6   Honor, clearly, by the agent's testimony, based on his training

7   and experience, the investigators in D.C., it is shown that

8   this Defendant was making threats.

9        He had over 30,000, according to him, followers on

10  social media.  And by reading the posts, it's clear that he was

11  inciting and calling people to gather arms and be ready and be

12  prepared to carry out this fight.

13        And even in his interview with Agent Chumak, he said,

14  you know, that he believes it's his duty as a citizen, as an

15  American, to rise up and do whatever the President says until

16  the President says to stand down.

17        And clearly by his post and by what he's stating,

18  even though he comes up with a lame excuse for what weapons

19  are, we all know what weapons are.

20        And so, when he's calling these people to arms on his

21  YouTube, on his social media, he clearly is inciting his

22  30,000-plus followers or 60,000, I can't remember, multiple

23  thousands of followers to rise up and be ready.  And, Your

24  Honor, those are -- that question threats.

25        The fact that he has used several aliases, Your

1    Honor, in the Parler account, he's known as Colonel T. Perez,

2    Retired, Colonel 007.

3            Your Honor, those right there, again, indicate

4    falsely that he was a member of the military when all the

5    evidence points to that he wasn't.

6            Even though even he comes up with another lame excuse

7    that the Department of Defense lost his paperwork.  I'm -- I've

8    never heard of that before.  And so, I would submit that,

9    again, that's another falsehood by this Defendant.

10           The name Perez, he uses that.  In this Pre-Trial

11   Services Report, he indicates that his father's name is Charles

12   Perez.

13           However, in his previous arrest in the Eastern

14   District, he indicates his father's name is Charles Lewis

15   (phonetic) and he's never had any contact with him.

16           So, again, not sure where the name Perez comes from,

17   but it looks like he's trying to use that, the fact that his

18   father's name is now Charles Perez, as a reason for him using

19   the name Perez.  And again, Your Honor, it's just complete

20   fabrication of his life.

21           And the items that were found at his residence are

22   still indicative of the life that he's continuing to live.  The

23   printing machine was found.  The false ID saying that he was a

24   colonel, again, was also found.

25           And that rises to another charge here, as we cited

1    before in the Eastern District.  I think it's Title 18,

2    1028(a)(5), something like that, which is the exact same

3    conduct that he was doing before.

4           And the fact that during the course of all of his

5    impersonating the numerous law enforcement agents, he engages

6    with the public.

7           He told a woman he was going to arrest her.  He had

8    law enforcement acting on two occasions that we know of acting

9    on information that he provided to them and utilizing

10   resources, again, supporting and living the lie that he has

11   been portraying.

12          And he's having these people who are on his social

13   media, the followers, follow him by him putting himself out

14   there, that he's a retired colonel, that he was actually in the

15   military when in fact, that we know that he's not.

16          And, Your Honor, all of that shows that he's a

17   danger.  I mean, he is a danger to the community.  Engaging

18   with the public while he's impersonating a law enforcement

19   officer is scary.

20          I mean, the fact that he is telling this woman that

21   he is going to arrest her, the fact that he falsely implicated

22   another person as a murder suspect.

23          I mean, he's dangerous, Your Honor.  And he was

24   detained previously after a detention hearing here in the

25   Eastern District.  And I truly believe he -- and that was just

1     based on information that they had up until 2003.

2          Several years later, he's continuing that same and

3     even more egregious conduct.  And it's just -- he should be

4     detained again.

5          As indicated in the Pre-trial Services Report, the

6     listed employment is inconsistent with the employment in the

7     PSR.  He had said previously that he was employed at several

8     different other places he didn't mention at this time.

9          He didn't mention to Pre-Trial Services that he was

10    employed as at NetJet, but he certainly provided that

11    information to the apartment complex in order to secure an

12    apartment and falsify not only a NetJets ID, fake ID, but also

13    fake employment stubs, which is exactly what he did in his

14    first conviction in the Eastern District in 2006 with the Home

15    Depot paychecks or paystubs.

16         There's no mention in the Pre-Trial Services of any

17    NetJet employment of $70,000 approximately.

18         There's also no mention that he's a pilot, when he's

19    clearly represented himself as a pilot not only to neighbors,

20    but to other individuals.

21         As also indicated by the testimony of Agent Chumak,

22    there's no confirmation of any employment at the 74 Delta

23    Biohazards.  None at all.

24         And, again, Your Honor, I just without any

25    confirmation of any employment, where he claims he's making

1    $5,000 a month, I just again, I would submit to the Court that

2    that's another falsehood.

3            He claims in his Pre-trial Services Report that he

4    was in the Army and received a general discharge.  Again, that

5    information does not appear to be true.

6            The fact that he, as Agent Chumak testified to,

7    multiple friends, contacts, a wife living in a different

8    country would also lead us to argue that he is a risk of

9    flight.

10           He has transferred money to these individuals in

11   another country.  And so, without ascertaining the true nature

12   of what those money transfers are for or his relationships with

13   these people or why his wife is in, you know, living -- he got

14   married to a woman in a completely different country, I would

15   submit to the Court -- and she's a permanent resident, I

16   believe, according to the Pre-Trial Services Report in Japan.

17           So he has the ability, of course, to flee and not

18   return.  Even though we have his passport, Your Honor, there

19   are some countries where you can travel to without a passport,

20   but not come back without one.

21           And we just don't know the extent of the people that

22   he knows living in other countries.  And the fact that he has

23   had recent travel to the Dominican had additional travel

24   scheduled to the Dominican, that he claims that he was tired

25   and/or had family coming in, I just think that that's all very

1    suspicious.

2          He provided a fictitious document that says that he

3    was honorably discharged in 2015 and it had the rank of

4    lieutenant colonel.

5          He assaulted a police officer in April of 1986.

6          He -- and I don't know how this happened, he received

7    a 34-year sentence in 2003 for stealing and forgery.  And he

8    wasn't even supposed be off release until July of 2026, but

9    apparently, he's no longer on parole.

10          When he was placed on probation or such parole

11   offenses, he had -- he was revoked approximately five times.

12   Most of those revocations were basically failing to comply with

13   conditions of release.

14          And I submit to the Court, including on conditions of

15   release here, when he had again, a history of noncompliance, we

16   just don't believe that that is appropriate here in this case.

17          He's had three incidences of Supervised Release

18   revoked when he's either committed another federal offense, or

19   again, failed to comply.

20          He just, Your Honor, is not a good candidate for

21   release.  We firmly believe that he is a danger, that he has

22   committed this offense of the threats.  I know at least one

23   other judge in our district has determined that the threats are

24   a crime of violence.

25          And, Your Honor, by just the nature of the threats

1    and the result of this -- these postings and the incitement of

2    what is going on clearly shows that people who engage in the

3    social media calling to arms, and this nonsense, that they are

4    a danger.  They're a danger to the community.

5           And that's even coupled with Mr. Smocks'

6    impersonation of other officers, law enforcement officers.

7    He's clearly a danger.

8           And for the flight, all of that other stuff I just

9    mentioned, coupled with his frequent travel, his contacts out

10   of the country.

11          Again, he was detained before in the previous case on

12   much, much -- I don't want to say much less evidence, but on

13   similar evidence that he's continued to engage in for numerous

14   years after he served his 30-month sentence, we would ask the

15   Court to take all of that into account and detain Mr. Smocks.

16          THE COURT:  Mr. Whalen?

17          MR. WHALEN:  Thank you, Your Honor.  Your Honor,

18   first, I want to talk about probable cause and we'll talk about

19   that first.  And then, we'll talk about the issue of detention.

20          I think the first thing that I think when you

21   look -- you finally look at those posts as a whole, they're not

22   threats.  I think they're conditional.  I think they're

23   precedent to other things happening.  And when you put them in

24   proper context, there's no threat made in either one of those

25   posts.

1        And I think it's interesting that the -- that you had

2    testimony before you that the original draft of the complaint

3    originally had screenshots of the entire posts that were going

4    to be presented to the magistrate.

5        And then, later on, it was decided not to present the

6    complete posts to the magistrate.  There was simply snippets of

7    it.

8        And so there, in our view, they're taken out of

9    context.  And so, why a magistrate has found probable cause to

10   sign a complaint, I think when you look at it as a whole, that

11   there's not probable cause that these were threats in and of

12   themselves, when you look at them as they are.

13       The second part, I think, you have to look at is

14   what's the culpable mental state before this offense?  And the

15   mental state that the Supreme Court in a case calls Elonis said

16   what it wasn't and it's not reckless or negligence, there has

17   to be an intent element to it.

18       So it can't be some reckless statement that you make

19   and that's enough for criminal liability, but they never chose

20   to define what it is.

21       And so, currently, there is a split in the Circuits

22   of what the intent requirement is.  No surprise, the 9th and

23   11th Circuit require a specific intent requirement, while the

24   5th Circuit just has a general intent, which I guess would then

25   be a knowingly.

1        And so, I think also too as it relates to the intent

2    part, during his interview, he denied that he had any intent to

3    threaten or any of that nature.  And I think that's important

4    to look at.

5        Now I think the Government will say, well, you can't

6    believe him, right, because he has all these false paperworks,

7    and therefore, he's a liar and he's not believable.

8        So then, does that argument count for what he posted?

9    You can't believe what he said, but we're going to believe what

10   he said here.

11       But on the other part of it is he is being truthful

12   when he admits to criminal conduct during his interview that

13   he's making admissions and when he says, no, that's not what I

14   meant, why is all of a sudden lying then but he's truthful when

15   he's here?

16       So they're picking and choosing, but I think when you

17   really look at it and based on the evidence you have, there's

18   no intent and there's certainly -- there's not enough evidence

19   to support a mental state on him.

20       The second thing too is that when you look at the

21   statute, it says there has to be a threat to injure a person.

22   And you don't have any evidence before you as it relates to

23   probable cause.

24       We have this general groups of people that we're not

25   sure what -- you know, we forget what RINOs means, but

1    we -- you know, but you look at the groups.

2           We have these groups of people, but we don't have any

3    one specific person.  It's not related to a specific person

4    who's going to be the focus of a threat for them to then be

5    able to say, I felt threatened by him.

6           So you don't have any evidence that says that anybody

7    said I felt threatened, specifically, I felt threatened by him.

8           But also, I think when you look at the two posts, the

9    way I see them, they're conditional.  They're based on

10   something else has to happen before that.

11          And I think when you get into conditional threats,

12   they're not threats.  And one of the cases from the '60s, I

13   think it was the Watts (phonetic) case, and I have copies if

14   the Court wants to look at those.  It related to somebody who

15   was protesting the draft.

16          And his statement was as soon as I -- if I get

17   drafted and get my rifle, the first person I'm going to take my

18   aim at is L.B.J.

19          He was prosecuted for that.  And the Supreme Court

20   overruled it and said, no, that's not a threat.  You have to

21   take it into context and look at it and it's political.

22          And so, they found that that wasn't sufficient

23   evidence to support that.  And so, when you look at and what's

24   just hyperbole.

25          So then, when you take the context of the statements

1    and put them on Parler, and you heard testimony from the agent

2    why did Parler get created, because Twitter and Facebook did

3    their cleansing of information that they didn't like.

4         And so, these like-minded people created Parler to

5    then post the things with like-minded people.

6         And so, what was the purpose of it?  It was to have

7    this free exchange of ideas on Parler now that they couldn't be

8    over here on these other avenues.

9         So you have like-minded people sharing their ideas

10   and thoughts.  Those aren't threats.  That's the free exchange

11   of ideas and speech.

12         And so, I think we have to be careful about when we

13   look at this discourse that we're having whether or not how

14   were we infringing upon his right to speak and say they're not

15   threats.  They're conditional.  The intent's not there.  It's

16   not directed to a specific person.

17         So I think we would ask you to really seriously look

18   at whether there's probable cause that he committed the offense

19   that they've alleged here.

20         And also, I find it interesting, I think the thing

21   that's interesting about this and I find it interesting, too,

22   that he's charged with a felony offense.

23         And the people that -- who breached the Capitol are

24   charged with currently, some of them, charged with misdemeanors

25   for trespassing, which to me, were a greater threat to human

1      life by their presence being there, but he's charged with a

2      more serious offense.

3              But I think you have to look at what he said and the

4      context he said it.  And there's not probable cause to believe

5      that he intentionally threatened to injure another person

6      through interstate commerce.  And so, we'd ask you to not find

7      probable cause.

8              So then, when we look at the issue of detention, I

9      think this is an interesting issue because I learned something

10     new every day about detention.

11             Because we can talk all day long about his criminal

12     history, and I think you have to put that in context of age.

13     And there's a lot there.  I don't disagree with that, but look

14     at the age of it and look at the dates of it.  It's -- the last

15     federal offense was 2005.  So now we're talking 15 years ago

16     completed Supervised Release.

17             Now I know they mentioned in there that during the

18     course of his Supervised Release, he had the fraudulent issue,

19     but they chose not to take any action against him and they

20     discharged the Supervised Release.

21             So I think look at his conduct from that point on,

22     but I think Ms. Batson went on about several things is that he

23     --

24             THE COURT:  Mr. Whalen, are you contesting that the

25     Supervised Release did not expire until 2019, which is very

1    recent?

2              MR. WHALEN:  No, yeah, I know that's recent --

3              THE COURT:  Okay.

4              MR. WHALEN:  -- but they chose not to take any

5    action, but he completed it I think is the point, bigger point

6    that I'm trying to make.

7              So but I think the interesting part about detention

8    is when we look at it, and getting back to my point, we learn

9    something new every day, that is the case in the Byrd case.

10             It's from 1992.  And it came to my attention because

11   there was a case opinion that just came out, it's not a

12   published opinion, it's U.S. v. Okhumale.  And it's 18 -- 813

13   Fed. Appx. 936.  And I have a copy for you, Judge, if you want

14   to look at it.

15             THE COURT:  I would like that copy.

16             MR. WHALEN:  Okay, and so what it -- it references

17   back to the Byrd case.  And what the Byrd case says let me get

18   you copies and then I can --

19        (Pause) 120856.

20             MR. WHALEN:  And so, what the Byrd case says is the

21   way I read it defendant's threat to safety of other persons or

22   to the community standing alone will not justify pre-trial

23   detention under the Bail Reform Act unless it establishes

24   conduct in violation of one of the six circumstances listed in

25   the statute.

1          And so, under 3142(f), now they say six and Okhumale

2     said six, too, but I think there's seven, but I can't count the

3     way they've numbered this thing, but I think when you look at

4     the issues that they have, the question becomes is it a crime

5     of violence because that's one of the issues.  I don't believe

6     it's a crime of violence.

7          An offense for which the maximum sentence is life

8     imprisonment or death.  The statutory maximum here is five

9     years, so that doesn't apply.

10          An offense of 10 years or more on the Controlled

11     Substance Act.  That's not the case here.

12          Any felony of such persons been convicted of two or

13     more offenses described in (a) and (c), which would be a crime

14     of violence or a drug case, that's not the case here.

15          Then the other one is any felony otherwise -- not

16     otherwise a crime of violence that involves a minor victim.

17     Not the case here.

18          So then it comes down to -- then it has 2(a), a

19     serious risk the person will flee or (b), a serious risk the

20     person will obstruct or attempt obstruct justice or intimidate

21     witnesses, et cetera.

22          I don't think there's any evidence of that.  So it

23     really comes down to is he a serious risk the person would

24     flee?

25          They have to have that, because that without it, in

1    and of itself, there are conditions that work in this fashion

2    to release him under 3142.

3            And so, I think when you look at is he a serious risk

4    to flee, and I don't think there's any evidence to suggest that

5    he is a serious risk to flee.

6            Yes, he's travelled outside the country, but he's

7    always returned.  He's always been on his passport.

8            They have confiscated his passport during the search

9    of his house.  He doesn't have any travel documents.  There's

10   no evidence that he attempted to make any travel documents.

11   And he's always returned.

12           And so, then the question -- so I don't believe

13   there's any evidence before you that he's a -- there's a

14   serious risk of flight based on that.

15           And I know Ms. Batson talks about that he was

16   detained previously, but that's back in 2005.  We're now here

17   in 2021 and looking at the facts today.

18           And so, when you couple it with the fact that, one, I

19   don't think there's any probable cause, but then when if the

20   Court's so finds, I think then when you look at it, there is

21   not the serious risk to flee.

22           The Court can fashion conditions:  electronic

23   monitoring, home confinement.  You can fashion that he not

24   engage in any social media, put things on his computer, things

25   of that nature.

1          We can interview the niece for a third-party

2    custodian.  So when you look at it, you have to make a finding

3    that there's no conditions or combinations of conditions.  And

4    there certainly are under the facts of the case.

5          So therefore, we'd ask you, one, find no probable

6    cause.  But if you do, that you fashion reasonable conditions

7    of release for Mr. Smocks, Your Honor.  Thank you.

8          THE COURT:  Thank you, Mr. Whalen.

9          MS. BATSON:  Your Honor, just to clarify, Mr. Whalen

10   indicated that there's not a person who can say that they were

11   threatened.  I don't believe that that is the law.

12         The threat has to be taken or intended as a threat.

13   And the reader would also take it to mean a threat.  There's no

14   requirement that a person has to say I feel threatened.  That

15   is not the law.

16         And then, as I indicated before, Judge -- one of the

17   judges, it is Judge Sean Jordan, indicated that this was a

18   crime of violence.

19         And in his opinion, in the Daniel Dunn (phonetic)

20   case, he addressed the Byrd and the Okhumale case as it relates

21   to this particular offense.

22         THE COURT:  Thank you, Ms. Batson.

23         Mr. Smocks, sir, can you please stand?

24         Mr. Smocks, based upon the consideration and all the

25   evidence that's been presented to the Court here today, as it

1   relates to the issue of the preliminary hearing, at this time,

2   I will find that there is probable cause to believe that an

3   offense has been committed; that you, sir, are the person who

4   committed that offense; and that you should be held over to

5   answer to the grand jury, sir.

6           As it relates to the issue of detention, as a

7   precursor, I'd like to reference that Judge Jordan, who is a

8   District Judge from the District, has previously considered the

9   issue as it relates to crime of violence.

10          And that term crime of violence does take on a

11  specialized meaning in the context of pre-trial detention.

12  This district has already previously determined that such an

13  offense being 875(c), constitutes a crime of violence under

14  §3142(f)(1)(A) for pre-trial detention purposes.  And certainly,

15  the Court takes that into consideration here today.

16          Mr. Smocks, sir, based upon the nature of the offense

17  with which you are charged, the evidence that's been presented

18  to the Court here today, including the witness testimony of

19  Agent Chumak, the exhibits that have been admitted, the Pre-

20  trial Services Report, which does recommend detention, and

21  certainly, my consideration of all the relevant factors, sir, I

22  do find that you shall be detained.

23          Mr. Smocks, you don't contest that the posts set

24  forth in the complaint are yours or that you authorized the

25  posts.  Those posts were public and went out to thousands of

1    followers, urging violence.

2            The agent has testified the complaint does not

3    include all of your posts.  The nature and circumstances of the

4    charges and the length of pre-trial sentence do weigh in favor

5    of detention here, as well as, sir, your history and

6    characteristics enhance the concern about both your danger and

7    the risk of flight.

8            You have a long history of impersonating law

9    enforcement and the military, creation and use of fraudulent

10   and false IDs, and other documents.

11           You have multiple repeated instances of Probation and

12   Supervised Release revocation, and an utter failure to comply

13   with conditions of release.

14           The Court's understanding at this juncture is there

15   are an excess of 10 past instances where you have failed to

16   comply with conditions that are set.

17           You've previously assaulted an officer and resisted

18   arrest as well, reflecting an increased risk to others, should

19   you fail to comply with any conditions.

20           Mr. Smocks has demonstrated a disregard for law

21   enforcement and public safety by those repeated violations of

22   prior conditions.  And I don't believe that he's presented

23   evidence or argument here today to overcome those particular

24   concerns.

25               To reiterate, Mr. Smocks has been charged with making

1    threats on the lives to others, calls to arms towards certain

2    groups of persons, and the Court as this time will hold that no

3    combination of conditions of release pending trial would

4    reasonably assure public safety or ensure that he is not a risk

5    of flight.

6            This determination is fully consistent with the Pre-

7    trial Services' recommendation following their view of him.   I

8    will note for purposes of the record that I will enter a formal

9    order memorializing this decision, however, this oral

10   pronouncement does reflect my ruling on this issue.  And I will

11   enter an order committing Mr. Smocks to the custody of D.C.

12           Ms. Batson, is there anything further from the

13   Government at this time?

14           MS. BATSON:  No, Your Honor.

15           THE COURT:  Mr. Whalen, sir?

16           MR. WHALEN:  No, Your Honor.

17           THE COURT:  All right, Mr. Smocks, sir, if you can

18   please go with the Marshal Service.  And Court is adjourned.

19           Counsel, can you please approach before you leave

20   here today?

21           And Lorene, can you please take us off the record?

22       (Proceedings concluded at 12:15 p.m.)

23

24

25

1                             **CERTIFICATE**

2

3

4              I, Chris Hwang, court approved transcriber, certify

5    that the foregoing is a correct transcript from the official

6    electronic sound recording of the proceedings in the above-

7    entitled matter.

8

9

10

11

12

13    _____            March 16, 2021

14    Chris Hwang                    Date

15    Transcriber

16

17

18

19

20

21

22

23

24

25