```
              UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,      .
                               .
           Plaintiff,          .   CR No. 21-0198 (TSC)
                               .
       v.                      .
                               .
TROY ANTHONY SMOCKS,           .   Washington, D.C.
                               .   Thursday, October 21, 2021
           Defendant.          .   1:50 p.m.
 . . . . . . . . . . . . . . . .
```

```
              TRANSCRIPT OF SENTENCING HEARING
          BEFORE THE HONORABLE TANYA S. CHUTKAN
             UNITED STATES DISTRICT JUDGE
```

APPEARANCES:

```
For the Government:          MICHAEL J. FRIEDMAN, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street NW
                             Washington, DC 20530
                             (202) 252-7566


For the Defendant:           JOHN L. MACHADO, ESQ.
                             Law Office of John Machado
                             503 D Street NW
                             Suite 310
                             Washington, DC 20001
                             (703) 989-0840


Court Reporter:              BRYAN A. WAYNE, RPR, CRR
                             U.S. Courthouse, Room 4704-A
                             333 Constitution Avenue NW
                             Washington, DC 20001
                             (202) 354-3186
```

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription.

P R O C E E D I N G S

THE DEPUTY CLERK:  Your Honor, we have criminal
action 20-198, United States of America versus Troy Smocks.
We have Mr. Michael Friedman representing the government,
Mr. Michael Machado representing the government, we have
Ms. Aidee Gravito representing probation, and we're in an
in-person hearing.

THE COURT:  All right.  Good afternoon, everyone.
Good afternoon, Mr. Smocks.

THE DEFENDANT:  Good afternoon.

THE COURT:  We are here for the sentencing of Troy
Anthony Smocks, who pleaded guilty to Threats in Interstate
Communications in violation of 18 U.S.C. § 875(c) on September
29, 2021.

I just want to caution anyone who might be calling in,
listening to this hearing, that it is not permitted to record
any portion of this hearing, audio or taking screenshots or any
such thing.  Since we are in person, obviously, the screenshot
doesn't apply, but no one who is participating or calling in to
the hearing is allowed to record any portion of the hearing.
That is barred by our federal and local court rules.

Now, in preparation for this hearing, I have received and
reviewed the following: the presentence report and sentencing
recommendation from the probation department, a copy of the
plea agreement signed by Mr. Smocks, a copy of the sentencing

1  memorandum from the government, sentencing memorandum from
2  Mr. Smocks, obviously the statement of offense.
3      Is there anything else that I'm missing here?  Those are
4  the documents that I've reviewed.  And the plea agreement.  I
5  don't know if I said that.
6      Mr. Friedman, you don't plan on any witnesses or anything,
7  do you?
8              MR. FRIEDMAN:  No.
9              THE COURT:  Mr. Machado, does that comport with your
10 understanding?
11             MR. MACHADO:  Yes, Your Honor.  We filed a memorandum
12 in aid of sentencing as well.
13             THE COURT:  It was not given to me a week before
14 sentencing, by the way.
15             MR. MACHADO:  My apologies, Your Honor.
16             THE COURT:  All right.  The final presentence report
17 and sentencing recommendation were filed in this matter on
18 October 4, 2021.  Both parties raised a number of objections
19 to the report's contents.  Specifically, the government objected
20 on September 24 to paragraphs 20 to 24, 27, 28, 61, and 90.
21 Mr. Smocks objected on the same date to page 2, paragraphs 20,
22 24, 27, 28, 61, 81, 85, 90, 98, and 102.
23     I'll address each objection in turn, offer the parties
24 an opportunity to provide any additional information not
25 contained in the papers already presented, and rule accordingly.

As a preliminary matter, none of these objections touch on the factual recitation of the circumstances of the offense that Mr. Smocks has pleaded guilty to.

"A district court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  That's 5 U.S. Sentencing Guideline at §6A1.3.

"A district court errs in relying on a presentence report's findings when they are internally contradictory, wildly implausible, or in direct conflict with other evidence." And I'm citing from *United States v. Pinnick*, 47 F.3d 434, 437.

Now let me start with Mr. Smocks' individual objections. With regard to Mr. Smocks' aliases, Mr. Smocks objects to the inclusion of aliases on page 2 of the presentence report and denies their usage.  The Probation Office indicates that this information was obtained by Mr. Smocks' National Crime Information Center -- that's NCIC -- record.

Mr. Machado, do you have any other information that you want on the record in this instance other than Mr. Smocks' denial?

MR. MACHADO:  Besides the comments that are in our objection, no, Your Honor.  We'd just comment that Kenneth Harris is the name of his nephew, and Vincent Shelton is the name of his brother.  So there may be some confusion.

1          THE COURT:  That's neither here nor there.  They may

2     still be aliases that Mr. Smocks has used, and certainly NCIC

3     records indicate that he's used those aliases.  Do you have

4     anything you want to add to the record that disputes or rebuts

5     that?

6          MR. MACHADO:  No, Your Honor.

7          THE COURT:  Okay.  Mr. Friedman, do you have any

8     further information on that issue?

9          MR. FRIEDMAN:  No.

10          THE COURT:  Okay.  Given this information was obtained

11     from NCIC records, the Court finds that the information from the

12     NCIC database has sufficient indicia of reliability to support

13     its probable accuracy per §6A1.3, and page 2's content as to

14     Mr. Smocks' aliases will be adopted by this court.

15          With regard to Mr. Smocks' military service that is in

16     paragraph 81 of the presentence report, Mr. Smocks objects to

17     the statement in paragraph 81 that he did not serve in the

18     United States Army, and I note for the record that at his plea,

19     at the completion of his plea, Mr. Machado stood up and wanted

20     to represent to the Court that Mr. Smocks, while not a retired

21     officer, previously served in the military.

22          Mr. Smocks states that he was stationed at Fort Sill for

23     three years and received an Army Achievement Medal and the

24     distinguished Howitzer Section Medal.  The Probation Office

25     indicates that a Bureau of Prisons Supervised Release Plan

1  signed and dated by Mr. Smocks in 2012 indicates that Mr. Smocks

2  has not served in the U.S. armed forces, U.S. military reserves,

3  and/or U.S. National Guard.

4      Further, the Probation Office maintains that the Department

5  of Defense indicates that it has no record of Mr. Smocks ever

6  serving in the armed forces of the United States.

7      Mr. Machado, do you have any further information you

8  wish to add to the record other than Mr. Smocks' assertion?

9          MR. MACHADO:  Your Honor, with regard to the

10  presentence report that was prepared back in -- I think it

11  was 2005 --

12          THE COURT:  By whom?

13          MR. MACHADO:  I'm sorry?

14          THE COURT:  By whom?

15          MR. MACHADO:  In Kansas -- or -- in Texas.  There was

16  some issue.  They could not find the records, and in fact there

17  had been an agreement by the government --

18          THE COURT:  I don't have it.  Did you proffer it?

19  Did you give me the page?  I mean, you're just telling me stuff

20  here, Mr. Machado.  You've disputed this assertion on September

21  24.  Do you have a page from that report?  Can I see that

22  report?

23          MR. MACHADO:  I do not.  I thought it was in the hands

24  of the presentence report writers.

25          THE COURT:  What paragraph?

1          MR. MACHADO:  It was not cited.  I'm talking about the

2    presence report from prior.

3          THE COURT:  Mr. Machado, you have come into this court

4    to dispute assertions made in the presence report, and you're

5    telling me about a prior presence report that has not been

6    presented to me, that I haven't seen, it's your characterization

7    only.  That's not sufficient.  Is that what you have?

8          MR. MACHADO:  At this point, yes, Your Honor.

9          THE COURT:  All right.  Mr. Friedman?

10          MR. FRIEDMAN:  Nothing additional from us.

11          THE COURT:  All right.  The Court finds -- I would

12    note that not only paragraph 81 -- just a minute.

13      All right.  The Court finds that the information the

14    Probation Office gleaned from the 2012 supervised release plan,

15    as well as the representations from the Department of Defense,

16    are reliable enough to avoid the bar set in *Pinnick,* and Section

17    81's content as to Mr. Smocks' military service will be adopted

18    by the Court.

19      I'm sorry.  Probation Officer, can you refer me to the

20    paragraph of the report where it refers to the Department of

21    Defense?  I'm looking for that.  I just want to make sure it's

22    in the report and I'm not imagining it.

23          MR. FRIEDMAN:  Judge?

24          LAW CLERK:  68.

25          THE COURT:  Oh, thank you.  Paragraph 68 of the

1    presence report indicates that the defendant was born in

2    Kansas City, Missouri.  In 1981 -- this is the defendant's

3    version -- that he enlisted at the age of 19 in the United

4    States Army and was stationed at Fort Sill in Lawton, that he

5    served as an active-duty Post Staff College for three years, and

6    that after the end of his service, he relocated to Kansas City.

7    The government asserts that they received no information -- oh.

8        The government claims that they received information

9    obtained from the Department of Defense which states, "There is

10   no record of the defendant having served in the United States

11   military."  Is that correct, Mr. Friedman?

12           MR. FRIEDMAN:  Yes.  We had provided to Your Honor

13   in earlier briefing, on earlier litigated issues in this case,

14   the sworn testimony of an FBI agent who testified in Texas

15   shortly after the defendant was arrested, and he testified

16   that the FBI had communicated with the Department of Defense --

17   and I'm sure I'm paraphrasing, but that the Department of

18   Defense had no record of anyone by the defendant's name serving

19   in the U.S. --

20           THE COURT:  That's correct.  I remember that.

21   We were litigating the Speedy Trial Act violation issue.

22           MR. FRIEDMAN:  Right.

23           THE COURT:  Right.  Okay.  So my finding is not only

24   based on the representations made from the 2012 supervised

25   release plan as provided by the Probation Office, but also from

the testimony proffered by the FBI agent during litigation on a motion to dismiss on Speedy Trial Act violation.

All right.  There are some purported typographical errors in paragraphs 85 and 98.  Mr. Smocks objects to the phrasing of both paragraphs.  In paragraph 85 he indicates that the $2,000 the Probation Office lists as an expense before his arrest is his rent payment.  Probation Office observes that the beginning of the paragraph indicates that the accounting is from before his arrest.

In paragraph 98 he indicates that the paragraph regarding a recommendation to the Bureau of Prisons is incomplete.  The Probation Office responds by noting that paragraph 98's content continues in the next paragraph as indicated by the colon in paragraph 98.  Just a minute.

Mr. Machado, do you want to be heard on that or want to add any further information to your challenge to those paragraphs?

MR. MACHADO:  No, Your Honor.  My pointing out on 85 was it listed the defendant reported his monthly expenses including, colon, $2,000 and then semicolon, and then explaining 400 for groceries --

THE COURT:  You have to speak slower, Mr. Machado.

MR. MACHADO:  My apologies, Your Honor.  The way that it was written is defense reported his monthly expenses included, colon, $2,000, semicolon, 400 for groceries, 158 for utilities, etc.  So I was just explaining the $2,000 was for the

1    rent specifically.

2              THE COURT:  All right.

3         Mr. Friedman, do you wish to be heard on that?

4              MR. FRIEDMAN:  No.

5              THE COURT:  All right.  The Court finds there's

6    no difference of opinion, really, as to paragraphs 85 and 98.

7    Both paragraphs 85 and 98 will be adopted by this court.  I

8    understand your explanation, Mr. Machado; I just don't think

9    it's necessary.

10        With regard to the total base offense level that's in

11   paragraphs 20 to 24, 27, 28, 90, and 102, both the government

12   and Mr. Smocks object to the presentence recommendation's

13   inclusion of a four-level addition to Mr. Smocks' base level

14   for actions resulting in substantial disruption of public,

15   governmental, or business functions or services, or (b), a

16   substantial expenditure of funds to clean up, decontaminate,

17   or otherwise respond to the offense, as well as a one-level

18   decrease for acceptance of responsibility by timely notifying

19   authorities of the intention to enter a plea of guilty.

20        Both parties indicate that the plea agreement indicates

21   a base offense level of 10 is appropriate for Mr. Smocks.  I'm

22   going to discuss these contentions later and make no finding now

23   as they do not touch on the circumstances of the offense.

24        With regard to Mr. Smocks' incarceration status as of

25   January 2006, that's paragraph 61, this paragraph concerns a

corroboration of certain information about Mr. Smocks with his

niece.  Specifically, paragraph 61 indicates that information

about Mr. Smocks' personal and family data remains

uncorroborated since contact with Mr. Smocks' niece was not

established by a phone call.  This phone call would have

confirmed Mr. Smocks' incarceration status as of January 2006.

The government objects, requesting that further

corroboration be included.  Mr. Smocks objects, stating that

his niece is still waiting for the phone call.  To this the

Probation Office responds that information was corroborated from

a docket search of the U.S. District Court for the Eastern

District of Texas.  My understanding is that Probation was

unable -- at least Probation in the report was unable to make

contact with Mr. Smocks' niece.

Mr. Machado, do you have any further information not in

the record you wish to add?

MR. MACHADO:  Your Honor, I followed up with

Ms. Harris.  She indicated that she had never received a call.

I've been able to reach her every time I've called her, but I'm

in no position to say she was or was not available.

THE COURT:  Did Ms. Harris submit any letters or

anything?

MR. MACHADO:  No.

THE COURT:  Okay.  Mr. Friedman, do you have any

further information not in the record to add?

1          MR. FRIEDMAN:  No.

2          THE COURT:  And, Probation, I believe you made a

3    representation regarding your attempts to contact Ms. Harris?

4          PROBATION OFFICER:  Yes, Your Honor.

5          THE COURT:  Could you state your name for the record?

6          PROBATION OFFICER:  Yes, Your Honor.  Aidee Gravito

7    for the Probation Office.  I did contact -- I attempted to

8    contact the defendant's niece.  There was no voicemail

9    activated.  Voicemail message was not able to be left on an

10   answering machine.  There was no answer on the telephone either.

11         THE COURT:  All right.  Thank you.

12     The Court finds that the docket search conducted by

13   the Probation Office has sufficient indicia of reliability

14   to support its probable accuracy per §6A1.3, and therefore

15   paragraph 61's content will be adopted by this court.

16     All right.  Mr. Friedman, does the government have any

17   further objection not yet mentioned to any of the factual

18   determinations set forth in the presentence report?

19         MR. FRIEDMAN:  No, Your Honor.

20         THE COURT:  Mr. Machado?

21         MR. MACHADO:  Court's indulgence.

22     I believe the Court has covered them with the exception,

23   obviously, of the sentencing issue.

24         THE COURT:  All right.  Yes.

25     Mr. Machado, have you and Mr. Smocks read and discussed the

1    presence report?

2            MR. MACHADO:  Yes, we have, Your Honor.

3            THE COURT:  All right.  And are there any disputed

4    issues of fact -- any further objection not yet mentioned to

5    any of the factual determinations as set forth in the report?

6            MR. MACHADO:  None as to factual determinations.

7            THE COURT:  Mr. Smocks, are you fully satisfied with

8    the services of your attorney, Mr. Machado, in this case?

9            THE DEFENDANT:  Yes, ma'am.

10           THE COURT:  And do you feel you've had enough time

11   to talk with him about the probation department's presentence

12   report and the papers that were filed by the government in

13   connection with the sentencing?

14           THE DEFENDANT:  Yes, ma'am.

15           THE COURT:  All right.  Thank you.

16       All right.  Hearing no further objection, I will accept the

17   factual recitation set forth in the presentence report regarding

18   the circumstances of the offense, and therefore the facts as

19   stated in the presentence report will be my findings of fact

20   for the purpose of this sentencing.  Well, having dealt with

21   the objections, I should have said, not hearing no objections,

22   having dealt with the objections that have been stated regarding

23   the report.

24       Now, with regard to the guidelines, the presentence report

25   lays out the Probation Office's calculation of the advisory

guideline range that applies to this case.  The calculation

was done using the 2018 guidelines manual and is as follows:

Beginning with the guidelines offense level, the applicable

guideline in this case is §2A6.1, which has a base offense level

of 12.  The Probation Office maintains, although this is

challenged by both the defense and the government, that when

an offense resulted in (a) substantial disruption of public,

government, or business functions or services, or (b) substantial

expenditure to clean up, decontaminate, or otherwise respond to

the offense, a four-level increase is applicable pursuant to

§2A6.1(b)(4).

The government has also represented that Mr. Smocks has

demonstrated acceptance of responsibility in a manner that

entitles him to a two-level reduction under §3E1.1(a) and that

Mr. Smocks assisted authorities in the investigation and

prosecution of this matter in a manner that entitles him to an

additional one-level reduction under §3E1.1(b).

Therefore, before I consider any departures or variances,

the Probation Office has calculated Mr. Smocks' total offense

level to be 13.  I realize that that is different than what the

government and the defense have calculated it to be, and I will

address that.

Turning to the applicable criminal history category, the

presentence investigation has found that Mr. Smocks has one

prior conviction that receives criminal history points in the

guidelines manual and that this conviction gives him a criminal

history point subtotal of 3.  This puts Mr. Smocks in criminal

history category II.  Based on the offense level and criminal

history category I've just discussed, the presentence report

calculates the guidelines sentencing range to be 15 months to

21 months of imprisonment.

Now, having determined the applicable guideline range,

or at least recommended in the presentence report, the next

step would be for me to consider departures and variances.

The presentence report does not include any departure grounds;

however, the plea agreement varies from the presentence report

on its computation of Mr. Smocks' offense level.  There's

further disagreement as to whether Mr. Smocks' criminal history

category is II or III.

First, as to the offense level, the plea agreement states

that the four-level increase contemplated by §2A6.1(b)(4) should

not apply to Mr. Smocks.  The first social media post that

Mr. Smocks sent on January 6, 2021, was before the start of the

riot and referred to conduct to occur on January 19.

The second social media post that Mr. Smocks sent out on

January 6 was sent after the riot had concluded.  Thus, both

parties agree Mr. Smocks' posts were not responsible for any

disruption or expenditure, and he should not be subject to the

four-level increase.

The plea agreement also does not include a one-level

reduction under §3E1.1(b) for acceptance of responsibility by timely notifying authorities of the intention to enter a plea of guilty.

Second, the plea agreement and subsequent memoranda filed by the government and defendant indicate that Mr. Smocks may have two applicable prior convictions rather than just the one indicated by the presentence report.  The 15-year period used by §4A1.2(e)(1) for including prior convictions or sentences in a criminal history category calculation would begin on January 6, 2006.

Mr. Smocks has one prior conviction that falls into this range.  Government counsel states, and defendant does not rebut, that a prior Missouri conviction from 2003 may extend into this period.  If it did, Mr. Smocks would have a criminal history point subtotal of 6 rather than the 3 indicated in the presentence report.

The plea agreement thus indicates a base offense level of 12 under §2A6.1 with a two-point reduction for acceptance of responsibility under §3E1.1, giving Mr. Smocks a total estimated offense level of 10.

With a criminal history category of II, this would result in a guidelines sentencing range of 8 months to 14 months of imprisonment.  With a criminal history category of III, this would result in a guidelines sentencing range of 10 months to 16 months of imprisonment.

1          Do the parties agree as to my analysis of the various

2     ranges under the different criminal history categories,

3     Mr. Friedman?

4                    MR. FRIEDMAN:  Yes.

5                    THE COURT:  Mr. Machado?

6                    MR. MACHADO:  Yes, Your Honor.  But just to clarify,

7     the issue of the one-point reduction, the additional one, in

8     our arguments did not apply because the base offense level being

9     12, it doesn't get the additional --

10                   THE COURT:  Yes.  I agree.  Yes.  Thank you.

11         Now, Section 3553 requires me to consider a variety

12    of factors including the sentencing ranges the guidelines

13    prescribe, which I've discussed, and also the applicable

14    penal statutes.  Just a minute.

15         The charge of Threats in Interstate Communications in

16    violation of 18 U.S.C. § 875(c) carries a statutory maximum

17    penalty of five years' imprisonment or a probation term of one

18    to five years.  If a term of imprisonment is imposed, the

19    statutes provide that Mr. Smocks face a supervised release range

20    of up to three years.  Per the guidelines, that range is one to

21    three years.

22         The statute of conviction sets a maximum fine of up to

23    $250,000, while the guidelines fine range is between $5,500 and

24    $55,000.  A special assessment of $100 per count is mandatory.

25    The statutory and guidelines restitution provisions are

1    inapplicable because there is no identified victim.  I'll note

2    for the record that Mr. Smocks, as part of his plea agreement,

3    has agreed to pay $500 in restitution.

4        Counsel, have I stated accurately the statutory framework

5    here?  Mr. Friedman.

6            MR. FRIEDMAN:  I just want to check on the restitution

7    you raised, Your Honor.

8            THE COURT:  Sure.  Let me double check myself.

9        This is a felony, so I may have the....

10           MR. FRIEDMAN:  I don't recall there being restitution.

11           THE COURT:  Hold on.  Let me just check.  I'm so used

12   to having it in these cases.

13       Oh, you're right.  Paragraph 12 of the plea agreement --

14   hold on.  You're right.  It does not provide for the typical

15   $500 restitution.  All right.  Although the plea agreement

16   states that Mr. Smocks understands that I have an obligation

17   to determine whether and in what amount mandatory restitution

18   applies in this case at the time of sentencing under 18 U.S.C.

19   § 3663(a).  Okay.  Thank you for pointing that out.

20       Mr. Machado?

21           MR. MACHADO:  Your Honor, just because we're talking

22   financial amounts, I just want to make sure that the Court knows

23   he does have to pay the $100.

24           THE COURT:  Right.  $100 is mandatory per felony

25   conviction.

1    MR. MACHADO:  Correct.  Thank you, Your Honor.

2    THE COURT:  All right.  Going now to -- I'm going

3    to skip ahead.  Here are my options given the disagreement with

4    Probation and the parties with regard to Mr. Smocks' criminal

5    history category and the enhancements.  It appears that I have

6    four choices here.

7    So I can, one, rely on the presentence report's calculation

8    of a final offense level and not include Mr. Smocks' 2003

9    Missouri conviction in calculating his criminal history

10   category.

11   Two, I can rely on the presentence report's calculation of

12   a final offense level and include Mr. Smocks' 2003 conviction --

13   the first one was not included.  The second one would include

14   Mr. Smocks's 2003 conviction in calculating the criminal history

15   category.

16   Three, I can rely on the plea agreement's calculation and

17   the government and defense's assertion that that is a correct

18   calculation of a final offense level and not include Mr. Smocks'

19   2003 Missouri conviction in calculating the criminal history

20   category.

21   And four, I can rely on the plea agreement's calculation

22   of a final offense level and include the 2003 conviction in

23   calculating the criminal history category.  A lot of options

24   there, but I've thought about this.

25   And with regard to the offense level calculation, the

presentence report and the plea agreement vary on two fronts,
first over the four-level special offense increase, and second,
over a one-level acceptance of responsibility decrease.  The
presentence report indicates that the four-level -- I've already
said why, because of disruption of public, governmental, or
business functions or substantial expenditure of funds to clean
up.

There's very little case law, especially in this circuit,
analyzing this, but other courts have indicated that district
courts should consider the interconnectedness between the threat
in question and the substantial disruption or expenditure
caused.

Having reviewed some of those cases, one is *United States
v. Bourquin*.  The other is *United States v. Anwar*, *United States
v. Mohammed,* and *United States v. Dudley.*  I do find that
Mr. Smocks' threats were not the cause of the January 6 riots.
There's no quantifiable effect attributable to his threats, nor
has the government alleged any.

For its part, the government, per the plea agreement,
does not seek the application of 2A6.1(b)(4) and the subsequent
four-level increase.  Though the authority is not controlling,
it is compelling enough for me to decline to give the four-level
increase, and therefore I will make the applicable final offense
level 10 as contemplated by the plea agreement.

Okay.  The question, then, is whether to include

Mr. Smocks' 2003 Missouri conviction in considering a criminal history category.  Doing so, if I include it, it changes Mr. Smocks' criminal history category to III instead of II and gives him a guideline range of 10 to 16 months instead of 8 to 14 months.  The plea agreement and the government's sentencing memorandum indicate the possibility of this conviction qualifying for consideration under the guidelines, but neither proves that it does.

Therefore, upon consideration, the Court will not apply Mr. Smocks' criminal history category.  I just don't have sufficient corroboration to make me confident that that enhancement is applicable.  The conviction does not apply to Mr. Smocks' criminal history category per §4A1.2(e)(1), and therefore Mr. Smocks' criminal history category is II.

The guidelines suggest a range of 8 to 14 months' imprisonment for this category or 1 to 5 years of probation. Supervised release may be between 1 and 3 years.

All right?  So that's where I am.  I end up, despite some indication that the probation -- I believe the presentence report recommendations and findings were definitely reasonable based on their interpretation of the facts as they saw them, but I agree that the government and the defense seem oddly united on this, and I don't think there's sufficient enough evidence to go against both of their assertions.  So it's going to be what was contemplated in the plea agreement.

1      MR. FRIEDMAN:  Your Honor?

2      THE COURT:  Yes.

3      MR. FRIEDMAN:  Just to clarify, the plea agreement

4  did acknowledge the uncertainty.

5      THE COURT:  Yes.  As it always did.  And I explained

6  that very firmly to Mr. Smocks at the plea, that that was simply

7  an estimate, that I was not bound by that estimate, I don't have

8  to go along with it, and I didn't.  But I do believe that

9  there's a colorable case to be made for the enhancement and for

10  the category of III for sure, but I'm just not -- in the end, I

11  come down to believing that there's not enough.

12      MR. FRIEDMAN:  Thank you, Your Honor.

13      THE COURT:  But I was prepared to add the enhancement

14  had I found there was sufficient basis, for sure.

15      Okay.  Any further objection, Mr. Machado, before I go on?

16      MR. MACHADO:  Your Honor, and I apologize for being

17  the person doing this, but the Court mentioned the minus 1 as

18  part of what it was considering.

19      THE COURT:  Well, it's no longer applicable.

20      MR. MACHADO:  Just wanted to make sure your record

21  was clear.

22      THE COURT:  Yes.  Given the range that I found, that

23  one-level reduction is not applicable.

24      MR. MACHADO:  And we are not seeking it, obviously,

25  for those reasons.

1          THE COURT:  Okay.  Thank you.

2      Now, after calculating the sentencing guidelines and

3  departures and deciding on whether to apply the enhancements

4  in this case, I will now hear from the parties with regard to

5  what they believe an appropriate sentence will be.

6      Mr. Friedman?

7          MR. FRIEDMAN:  Yes, Your Honor.

8      Your Honor, this was a serious crime.  The making of

9  threats, the transmission of them through social media

10  interstate communications in a manner that the threats were

11  widely disseminated, is a serious violation of our federal

12  criminal law.

13      What makes it more serious is that the threats really

14  involved the threat of political violence of the sort that is

15  anathema of our democratic system and culture.  The defendant's

16  social media account falsely purported to identify him as a

17  retired military officer, which would reasonably make the reader

18  of the posts give extra credence to such a threat given the

19  appropriately high esteem that our society places on a retired

20  military officer.

21      And the defendant, this wasn't a one-time thing.  It was

22  more than one threatening social media post on the same day

23  directed at different groups of people.  And as we explained

24  in our sentencing memorandum, there was a history of vitriolic

25  language from the social media account from the time period of

1    the November 2020 election and going forward.

2         Turning to the defendant's history and characteristics,

3    the defendant clearly has a very lengthy criminal history, with

4    around 18 prior criminal convictions.  What those criminal

5    convictions largely have in common is efforts by the defendant

6    to obtain money from victims by false pretenses, sometimes by

7    dramatically false pretenses, including pretending to be federal

8    agents, law enforcement officers.

9         The defendant also has a history of violating terms of

10   probation and violating terms of supervised release, resulting

11   at times in revocations of supervised release in the past.

12        But the vast majority of the defendant's criminal

13   convictions occurred more than 20 years ago, and that's the

14   reason why the criminal history score is not so high as one

15   might imagine.  The presentence report indicates that the

16   defendant recently successfully completed a term of supervised

17   release in 2019.

18        The defendant does have some history of employment, a

19   high school equivalency degree at least, and he did the right

20   thing by accepting responsibility for his misconduct and

21   pleading guilty in this case.

22        The sentence that Your Honor imposes, of course, must

23   promote respect for the law.  It must provide for a just

24   punishment.  The sentence should send a message in a form of

25   punishment to this defendant and as a deterrent to the community

1     that threatening statements made in interstate communications

2     are serious, that they will not be tolerated, that they can

3     and will result in criminal prosecution and punishment from

4     the Court.

5          And in this case it's -- of course, there's a need for the

6     sentence to avoid any unwarranted sentence disparities, and if

7     Your Honor imposes a sentence within the sentencing guidelines

8     range, there won't be any unwarranted sentence disparities.

9          So given all the issues and in the unique circumstances

10    of this case, we do think that a sentence at the low end of the

11    guidelines range is the appropriate one, which in this case

12    would essentially be the same as a sentence of time served.

13         It's very important, we believe, that Your Honor impose a

14    lengthy term of supervised release given the criminal history

15    and the long-ago but not-that-long-ago history of some probation

16    violations and supervised release revocations.  We think it

17    very important that Your Honor impose a full three-year term

18    of supervised release, during which time the defendant should be

19    ordered to participate in vocational training with the Probation

20    Office.  Thank you, Your Honor.

21              THE COURT:  Thank you, Mr. Friedman.

22         Mr. Machado?

23              MR. MACHADO:  Thank you, Your Honor.

24         Your Honor, since January 15, my client has been detained.

25    And it took approximately over two months, as the Court knows,

because of some litigation we had getting him here to this
location.

Now, we are in an interesting time where we're dealing with
a pandemic as well as having Mr. Smocks incarcerated, which
essentially has the two strongest things that I can mention in
that regard is that, as the Court saw from some documentation,
Mr. Smocks, while he was in Grady County in Oklahoma, he
contracted COVID.

The verdict is still out, no pun intended there, with
regard to the aftereffects or long-term effects of COVID.
Apparently, since he did have it, hopefully that's not an issue
that he'll have to be dealing with, but given his age, there may
be some effects.

But more importantly, while he's been at the jail, his
conditions have been rougher than usual in that he's had to
be 23 hours a day within his cell.  There's been lockdowns for
various reasons, and apparently Mr. Smocks has not -- there have
not been any violations, and he's behaved in an appropriate
manner while at the jail.

I would ask also the Court to consider the fact that,
speaking to the factors of 3553, first of all, obviously,
Mr. Smocks has accepted responsibility, and he acknowledges that
his threats were inappropriate and has therefore pled guilty to
the charges.  I realize that any threat is a bad threat, but I
would -- not to minimize the threat itself, but we don't have

1    any -- the threats that he did make were ones that were of

2    a general population.  While still being wrong, it wasn't

3    individual people who had to be concerned about his individual

4    threat.

5            THE COURT:  Wait.  He made threats against members

6    of Congress and tech company executives.  Those aren't people?

7    I mean, granted, they're groups of people.  He didn't call out

8    Bill Gates or anything, but that's not specific enough?

9            MR. MACHADO:  Well, Your Honor, my point is that he

10   was saying, this person is going to have to -- you know -- that

11   is a lot worse than a larger group.

12           THE COURT:  I don't know.  You might want to ask

13   the members of Congress who were hiding under the desks in

14   the Capitol that day.

15           MR. MACHADO:  And we're not in any way trying to

16   minimize that.  But we don't have a specific person who had

17   a situation where because of this threat they were concerned

18   for their safety.  I'm not in any way saying -- it's a threat.

19   He pled to it.  We're not disputing that.  But I would suggest

20   that when you're talking in general, particularly when we're

21   talking, for instance, RINOs, as in Republican in Name Only,

22   I mean what group is that being defined as?

23           THE COURT:  I'm not even going to go there,

24   Mr. Machado.

25           MR. MACHADO:  All right, Your Honor.  I'll move on,

1    but I hope the Court  --

2                THE COURT:  That's open to a lot of debate, but that's

3    a political question and certainly not one that I'm going to --

4                MR. MACHADO:  Nor was I asking the Court to answer,

5    nor would I even try to answer.  But my point being just we

6    have generalized groups as opposed to individual people, which

7    obviously could put a lot more fear into a particular person

8    seeing that there was a specific threat made to them.  I'll move

9    on.  I'm not trying to make too much out of that, but I did want

10   to raise that point.

11       Your Honor, his criminal history is quite dated.  His most

12   recent contact, I believe, was in 2006.  And so he therefore has

13   had -- he has not been in the past -- well, over a decade --

14               THE COURT:  Well, his last contact may have been in

15   '6, but then because of various revocations and issues like

16   that, he remained under supervision till at least 2019.  Isn't

17   that correct?

18               MR. MACHADO:  I thought it was 2015.

19               THE COURT:  '15?  Maybe it was '15.

20               MR. MACHADO:  If I'm correct.  2015?

21               THE COURT:  I think Probation can...

22               PROBATION OFFICER:  Your Honor, for the record,

23   the last supervised release term expired January 16 of 2019.

24               THE COURT:  Thank you.

25               MR. MACHADO:  I understand the Court is asking for

1    vocational training, and Mr. Smocks will do it if needed, but

2    he's been --

3                THE COURT:  You mean that's Probation, not the Court.

4                MR. MACHADO:  I'm sorry.  Either probation or

5    supervised release.  I think both of them are an option given

6    where he is as far as the zones for the sentencing guidelines.

7    But he has his GED already but has been working and will proceed

8    with continuing his work.  He's an author.  I think there was

9    some issue originally about --

10               THE COURT:  When you say continue his work, are you

11   talking about his work as a currency trader?

12               MR. MACHADO:  Day trader, and his own company having

13   to do with disinfecting -- I believe it's in the record.

14          The name of the company?  Court's indulgence.

15          (Counsel conferring with Defendant.)

16               MR. MACHADO:  74 Delta.

17               THE COURT:  And again, other than the defendant's

18   statements regarding this, I was given no corroboration that

19   any of that is true.

20               MR. MACHADO:  Okay.  Well --

21               THE COURT:  But I'll accept your representation.

22               MR. MACHADO:  It's harder to do that at the jail, to

23   be honest.

24               THE COURT:  Yes.

25               MR. MACHADO:  But nevertheless, he has been employed.

1    I think if the Court feels it's necessary for him to get some

2    mental health treatment, just because of a mention he needed

3    some counseling, I think that might be helpful and beneficial

4    to Mr. Smocks.

5         Mr. Smocks has been a pleasure to work with, Your Honor.

6    He's been one of my smarter and one of my more involved clients

7    in wanting to make sure that both he knows everything that's

8    going on, reviewing everything, helping me as far as preparing,

9    and most importantly, Mr. Smocks was willing to accept

10   responsibility even after reviewing all the law and all the

11   case law and saying, I need to accept responsibility for this.

12        And I think that usually when you have clients who do

13   research on their own, you turn out having to fight them over

14   about what is their choice, what is the best option legally, and

15   there's a lot more discussion and interaction and sometimes it

16   ends up going to trial.  But he wanted to accept responsibility,

17   and so he did.

18        Your Honor, Mr. Smocks -- a lot of my comments had to do

19   with the plus-four, so that saved about a third of my arguments.

20        He has a very supportive family.  He has basically lost

21   everything that he had in Texas, but he's going to return to his

22   family in Missouri, who have been very involved.  They've helped

23   as far as getting communication, and they plan to allow him to

24   live there.  So he's going to have a place to go right back in,

25   which is going to be a very good thing for him considering that

1   he's lost a lot over this.

2        I would note that his wife is still in Japan right now,

3   and they're having issues.  And so part of why he wants to

4   resolve the issue is so that he can help his wife, who has

5   been suffering -- they were married in 2019, but it's been a

6   difficult challenge, and he wants to be able to help and knows

7   that he can help more if he's out with conditions -- if the

8   Court accepts it, of course.  But he wants to get back to a

9   normal life, and he wants to make sure he can assist his wife.

10       The one last thing, Your Honor, I'll just mention is the

11  fact that during this process, at the time that Mr. Smocks was

12  arrested, they basically used the terms of the Patriot Act

13  against him, and they ended up closing his bank accounts, and

14  also he was on the no-fly list.

15       And while I've been trying to find some case law that

16  would indicate that in fact -- that that is something that the

17  Court can take into consideration -- or the Court can act upon,

18  I should say -- with regard to that, I'm going to make that

19  request.  I haven't seen anything specifically as to that.

20       Mr. Friedman has been more than helpful, and I'll be in

21  communication with him, and I've already informed him of this

22  issue.  And again, Mr. Smocks wants to return to a normal life,

23  and being on the no-fly list for -- and the actions taken under

24  the Patriot Act make it very difficult for him to be able to do

25  that.  And we will ask that, to the extent that the Court feels

1    that it has some ability to assist in that regard -- again,

2    I'll speak to Mr. Friedman, and have spoken to Mr. Friedman

3    on this issue -- we would ask for that assistance.  There's

4    one additional point that I --

5            THE COURT:  Well, let me just stop you there,

6    Mr. Machado.

7            MR. MACHADO:  Yes.

8            THE COURT:  I have no idea what the law is.  You

9    haven't provided me with any authority.  I'm certainly not

10   going to just act off the top of my head and grant relief in

11   an area where I'm not even sure that I have any jurisdiction

12   or authority.  If you are seeking relief for Mr. Smocks in that

13   regard, you would have to file a written motion with this court

14   explaining the basis of your request for the relief and why you

15   believe I have jurisdiction or authority to grant that relief.

16   And, obviously, the government would have an opportunity to

17   respond.  I'm not prepared to act on that today.

18           MR. MACHADO:  I understand.  And I will continue to do

19   so.  Unfortunately, all that I found had to do with just civil

20   lawsuits specifically asking a judge for a person to be removed.

21           THE COURT:  Right.

22           MR. MACHADO:  But not in the criminal context.  But

23   I'll keep on trying, and if I find something appropriate, I'll

24   file something with the Court, although I'm sure that I can try

25   and make more headway with Mr. Friedman.

1      THE COURT:  Maybe.  Maybe the best way to get that is

2   to go around me and straight to Mr. Friedman.

3      MR. MACHADO:  Well, if I find a reason that the Court

4   can help, I will present something.

5      THE COURT:  Okay.

6   Sorry.  Go ahead.  I interrupted you.

7      MR. MACHADO:  No, that's all right, Your Honor.

8   The other thing I would like to raise is something I would like

9   to approach the bench on.  I don't know what the arrangements

10  are.

11     THE COURT:  We can use a microphone, right?

12  The intercom?

13     THE DEPUTY CLERK:  They took them out for trial.

14     MR. FRIEDMAN:  Could I just very briefly respond

15  to Mr. Machado's last point?

16     THE COURT:  Sure.

17     MR. FRIEDMAN:  He has raised some of those issues

18  with me, but I have not indicated in any way that there's

19  anything I could do to be helpful if any of those things are

20  true.

21     THE COURT:  Sure.  Totally understood.  You can

22  negotiate with Mr. Friedman.  If you think you have a legal

23  basis to approach the Court for relief, you can do that, but

24  I'm not dealing with that today.

25     MR. MACHADO:  This is a separate issue, Your Honor.

1          THE COURT:  All right.  You may approach.

2      (Sealed Bench Conference.)



1

2

3         (End of bench conference.)

4             THE COURT:  All right.  I've heard the representations

5     made at the bench, and Mr. Machado, I will take into account the

6     information that you provided.

7             MR. MACHADO:  Okay.  Thank you, Your Honor.

8         Your Honor, as I said from the beginning, Mr. Smocks

9     has been detained for over nine months.  And as the government

10    indicated, they're requesting the low end of the guideline,

11    which would be eight months.

12        We're asking the Court to give Mr. Smocks a sentence of

13    time served given the fact that he has spent a rather gruelling

14    nine months detained, particularly the seven months over at the

15    D.C. jail, or I should say CTF more specifically, and we believe

16    that that has been a sufficient deterrent in order for

17    Mr. Smocks not to proceed and commit any acts of this kind

18    any further.

19            THE COURT:  Let me ask you, Mr. Machado.

20            MR. MACHADO:  Yes.

21            THE COURT:  Mr. Smocks has 17 prior convictions.  He

22    spent repeated -- granted, a long time ago -- terms in prison.

23    Why do you think this will be sufficient deterrence?

24            MR. MACHADO:  Well, Your Honor, first of all, this is

25    the type of deterrent that can easily be resolved with him not

1    doing -- putting threats out --

2            THE COURT:  He could have not committed fraud and all

3    those other 17 crimes that he committed by being sent to prison.

4    He didn't.  He just kept doing it for, you know, since he's been

5    18 years old.  Why would this period of nine months be any

6    different than any other time of incarceration he served?

7            MR. MACHADO:  I know that Mr. Smocks is going to make

8    reference to that.  In my opinion, I think Mr. Smocks was

9    intending to -- he was -- well, first of all, he was giving his

10   political opinion and crossed the line, and he knows that he

11   crossed the line, which is why he accepted responsibility.  And

12   I think, now that he knows that there's a line that shouldn't be

13   crossed, it's a matter of adjustment of attitude, and he can

14   control that by not crossing that line any further.

15       And Mr. Smocks is a man of strong opinions, but he knows

16   that when we get to a certain point, you cannot say the things

17   that you say particularly when it causes fear and leads to

18   people to be concerned about their safety.  And so I think he

19   gets that.  And I think that's a matter of him being able to

20   adjust his attitude while being true to his thoughts and

21   convictions.

22           THE COURT:  Okay.

23           MR. MACHADO:  So it's just a matter of don't go that

24   far, and I think he understands that.

25           THE COURT:  All right.  Thank you.

1          MR. MACHADO:  Thank you, Your Honor.

2          THE COURT:  Mr. Smocks, I told you at your plea that

3     at your sentencing you would be free to speak to me, to speak to

4     the Court, to address anything you wanted me to hear about your

5     sentencing.  But you're also free not to, and if you decided not

6     to, I would not hold that against you.  But if you have

7     something you would like to say, I would certainly listen very

8     carefully.  Would you like to speak on your behalf?

9          THE DEFENDANT:  Yes, Your Honor, I would.

10         THE COURT:  All right.  You may speak right into the

11    microphone.

12         THE DEFENDANT:  First, good afternoon, Judge.

13         THE COURT:  Good afternoon.

14         THE DEFENDANT:  Your Honor, first I would like to

15    thank my attorney, Mr. Machado.  Over the course of this case,

16    we have developed a respectable attorney-client relationship

17    as well as a pretty good personal friendship.

18         Your Honor, with that being said, Your Honor, I pleaded

19    guilty to a criminal offense, and I stand by that.  And however

20    you punish me, well, ma'am, that's my punishment.

21         Your Honor, I'm no whiner.  But, you know, there's some

22    foul things that have been going on, and I'd like to bring the

23    Court's attention to it.  If I sit here today without addressing

24    this issue, then I feel that I dishonor my grandmother, my

25    uncles, and everybody else who got firehosed, bitten by dogs,

1    and beaten with billy clubs while marching in the streets for

2    the rights of black people to be treated equal under the law.

3         And I understand what I'm saying is probably taboo, because

4    a lot of people are uncomfortable talking about racism and

5    injustice, but they don't seem to be uncomfortable with dishing

6    it out.

7         This year the FBI arrested 638 people in connection with

8    the Capitol riots of January 6, and personally, I think that

9    what did end up happening at the Capitol, that was idiotic.

10   It shouldn't have happened.  And I'm not sure if the Court is

11   aware of this, but of all 638 people to be arrested, I'm the

12   only Black person in America sitting in jail for what happened

13   on January 6.

14              THE COURT:  You aren't.  I had one before me

15   yesterday, Mr. Smocks.  You are incorrect.

16              THE DEFENDANT:  Is he in jail, ma'am?

17              THE COURT:  He's in jail.

18              THE DEFENDANT:  I stand corrected, because he's not

19   in the pod where we're in.

20              THE COURT:  I think he's over at the D.C. jail.

21   He's not at the CTF, but he was in front of me yesterday.

22   And he's incarcerated, and I believe the government arrested

23   somebody else this week or last week who is incarcerated.

24   So you would not be correct.

25              THE DEFENDANT:  Okay.  Your Honor, on October 1

of this year, U.S. District Judge McFadden from right here in
D.C., he gave an interview on CNN.  And in that interview he
said, and I'm quoting, I believe the Department of Justice has
been uneven-handed with President Donald Trump supporters who
stormed the U.S. Capitol on January 6, unquote.

THE COURT:  Are you sure he gave that on CNN, or did
he say that in open court?

THE DEFENDANT:  It was reported on CNN.

THE COURT:  It was reported on CNN.  I believe he made
that statement in court.

THE DEFENDANT:  Yes, ma'am.  And the Justice
Department, they haven't been even-handed with me either, ma'am.
They treated me differently or worse than they treated the white
people that was inside the Capitol that day.  I'd like to
elaborate on that.

Your Honor, I'm a kid of the 1960s, the early 1960s, and
I actually had to ride at the back of the bus with my mother
because we weren't allowed to ride in the front.  Only white
people were supposed to do that.  And I couldn't drink from
the water fountain because they were only for white people.

I'm almost 60 years old.  I've lived through segregation,
discrimination, degradation, and a lot of humiliation.  So I
know a little bit about racism and bigotry, and both are alive
and well right here in Washington, D.C.'s DOJ.  Over the last
four months I've looked as the government has allowed numerous

white people who was actually inside the Capitol on January 6
and charged with felonies to plead guilty to misdemeanors and
then go on with their lives, and I've expressed this concern
with my attorney.

Your Honor, 81 days ago, my attorney informed this Court
that we were trying to reach a misdemeanor plea deal with the
government, and you said that you would still want a PSR before
sentencing even for a misdemeanor.

THE COURT:  And I have required it.  I have gotten a
PSR for every misdemeanor sentencing I've had.

THE DEFENDANT:  Yes, ma'am.

But when we asked the government if I, you know, could
plead guilty to a misdemeanor, I was told no, the DOJ won't
approve it.  However, Karl Dresch, who was detained in the
cell right next to me, with three felonies and four misdemeanor
charges from January 6, and was also on of the Florida Senate
chambers with a violent criminal past, was allowed to plead
guilty to a misdemeanor charge of picketing and then go on with
his life, time served, he was white.  And he was from the same
group that the Department of Justice was calling extremists.

And then on September 29, the very same day that I was
before this court pleading guilty to a felony, the Department
of Justice was allowing Dawn Bancroft, a white woman from
Pennsylvania, to plead guilty to a misdemeanor charge when she
was actually inside of the Capitol on January 6 and wrote in her

social media post, and I quote, "I was looking for Pelosi so I
could put a bullet in her freaking brain."

So we have social media posts threatening communications
in interstate commerce, and by her own words, inference that she
had a gun in the Capitol with intent to murder the Speaker of
the House.  But she gets to plead guilty to a misdemeanor and
then go on with her life.

And, Your Honor, on the very same day, September 29, two
other white men, Erik Rau and Derek Jancart, get a 45-day
misdemeanor sentence, and they were also in the Capitol.  I've
been locked in a small, solitary confinement cell for over seven
months.  I'm not even allowed to get a haircut and a shave.  But
they get 45 days and then simply go on with their lives.

And it doesn't stop there.  On October 6, the Department
of Justice allowed Brandon Straka, who was originally facing two
felonies from January 6, one with a ten-year statutory maximum,
the other with a five-year statutory maximum, but he was allowed
to plead guilty to a Class B misdemeanor with a $500 fine.
Again, he's a white guy.

Your Honor, this is racism.  This is exactly why there
are far too many black and brown men than there are whites
in American jails and prisons today for the similar or same
conduct.  And this isn't the Deep South.  This is Washington,
D.C.  This is the flagship of America.

The people working here, they're supposed to be the ones

1    fighting against systemic racism.  But their words and their

2    actions, they don't align.  It was right here in 1963 in the

3    District of Columbia that Dr. Martin Luther King gave his famous

4    "I Have a Dream" speech.  But 50 years later, Black Americans

5    are still facing the same old dream for equal treatment under

6    the law.

7           THE COURT:  Is that what you were encouraging these

8    protesters to do on January 6, Mr. Smocks, protest to end racism

9    and discrimination?  Is that what you were exhorting them to do

10   from your hotel room?

11          THE DEFENDANT:  No, ma'am.  I don't believe in racism

12   of any kind, whether it's BLM or the Trump supporters, you know.

13          THE COURT:  All right.

14          THE DEFENDANT:  Black people and white people, they

15   should have equal civil rights.  Everything should be equal.

16   I don't approve of white supremacy or black power or anything.

17   We're all Americans.

18          THE COURT:  Sorry.  I interrupted you.

19   Please continue.

20          THE DEFENDANT:  Your Honor, you know, I'm no Dr. King,

21   not by a long shot.  But we do share the same skin color, and we

22   share the same sense of justice.  I just want to be treated

23   equal.  If I do something wrong, then I'll take the punishment

24   for that.  But I want it to be equal with the white person that

25   does the same wrong.  That's all I'm asking.

1       But my question is, when will the bigotry end?  You know,

2    it's been over 50 years, and that's a long time.  White police

3    are still killing us in the streets, and white lawyers are still

4    over-prosecuting us in the courts.  When does it end?  Your

5    Honor, I'm just trying to figure it out.  Thanks for allowing

6    me to speak.

7          THE COURT:  All right.

8       As with all sentencings, the Court must balance the factors

9    it has to consider in sentencing, bearing in mind that the

10    sentence imposed should be sufficient but not greater than

11    necessary to comply with the purposes of sentencing.

12       These purposes include the need for the sentence imposed

13    to reflect the seriousness of the offense, to promote respect

14    for the law, and to provide just punishment.  The sentence

15    should also deter criminal conduct, protect the public from

16    future crimes by the defendant, and promote rehabilitation.

17       I must also consider the nature and circumstances of the

18    offense, the history and characteristics of the defendant,

19    the types of sentences available, the need to avoid unwarranted

20    sentence disparities, and the need to provide restitution.

21    I've considered all these factors, and I'll discuss some of

22    them here.

23       With regard to the nature and circumstances of the offense,

24    Mr. Smocks bought a plane ticket and traveled to the D.C. area

25    on January 5, the day before the riot.  On the morning of

January 6, he started posting messages on social media to tens
of thousands of users.  He claimed, falsely, to be a retired
military officer and encouraged readers and listeners to stand
with the so-called patriots who were converging in Washington,
D.C.

After the riot was over and the Capitol was secured,
Mr. Smocks again posted messages on social media, exhorting
readers to, and I quote, "Get our personal affairs in order,"
and I again quote, "Hunt these cowards down like the traitors
that each of them are."

He went on to say, "Today the cowards ran as we took the
Capitol.  They have it back now only because we left.  It wasn't
the building that we wanted.  It was them."  And I'm not even
going into the actual threats that he made against political
representatives and tech executives in this case.

The irony of these statements, as I'm sure you're aware,
is that Mr. Smocks, from the safety of his hotel room, actually
had the nerve to call the people who were doing their jobs that
day -- the true patriots, in my opinion, who were ensuring
the transition of power -- cowards.

These people, these congressional representatives, their
staffs, and the law enforcement officers who tried valiantly,
even though they were outnumbered, to try to do their job that
day, were the real heroes of that day, yet Mr. Smocks has the
audacity to call the rioters who sought to violently overturn

the legitimate election results "patriots."

I've said before, and so have my colleagues, that what happened on January 6 was no less than an attempt to stop the orderly transition of power and to violently overthrow a duly elected government.  I don't need to dwell on how seriously I take those events.  Mr. Smocks wasn't there, but, by his words, he was encouraging the rioters, and he was threatening people.

With regard to the history and characteristics of the -- and let me just address Mr. Smocks' words to the Court just now. Mr. Smocks, on January 6, encouraged people who were actively fighting law enforcement, people who were actively engaged in trying to stop the transition of power.  Many of those people were violent.  Many of them defaced the halls of Congress.  Many of them stalked the halls, calling out for the Speaker of the House and the Vice President of the United States.  They erected gallows outside.

Mr. Smocks now seeks to somehow compare himself and drape himself in the mantle of racial equality and civil rights, and I for one find that offensive.

Yes.  A judge on this court, and others, have said -- and that is their position -- that it is their belief that the Department of Justice has not been even-handed, and I have said in open court that I disagree with that position.

I disagree with the proposition that the Department of Justice has been uneven given that there were people

demonstrating, largely peacefully, for civil rights arising

out of the murder of an unarmed man.  That is not the same as

an attempt to violently disrupt operations of Congress.  Those

two are not the same.  That is a false equivalence.  And I have

said it before, and I will say it again.

You come into this courtroom and you sit here and you try

and make yourself out to be a victim of racism, Mr. Smocks, and

again, I find that offensive.  People died fighting for civil

rights.  People were gassed.  They were beaten.  They were

driven -- you know, they were tortured mentally and physically.

And for you to hold yourself up as somehow a soldier in that

fight is really quite audacious.

There were very few, as I understand it, African Americans

participating in those protests on January 6.  That's how it --

them's the facts.  I personally have had two African American

defendants, both detained.  One yesterday was before me, and

you.  So you're not the only one, and I believe there are

others.  So to somehow claim that you are the only person and

you are somehow being singled out or treated unfairly, again,

is pretty audacious.

I haven't seen any evidence that protesters are being

treated differently because of their race or because of their

gender or anything else.  I have seen the prosecution make

distinctions among people for their actions, whether they went

into the Capitol, whether they assaulted law enforcement,

whether they damaged property, whether they stole property,
whether they made threats.  That is the distinction I've seen
the Department of Justice make, and that is their right.  I
have not seen a scintilla of evidence that their prosecutions
have been racially motivated.

With regard to the history and characteristics of the
defendant, Mr. Smocks is 59.  He has a lengthy criminal record
of approximately 17 prior convictions, beginning when he was 18.
Most of his crimes involved some form of deception and
fraudulent behavior, and he's frequently impersonated a law
enforcement or military officer, as he did in this case.

In fact, here Mr. Smocks falsely claimed to be a retired
military officer and even told the presentence report writer
that he served in the military.  I have no reason to believe
this is true, based on the Department of Defense representations
to the FBI agent who provided those representations to this
court in prior litigation, as well as a release plan that was
prepared in a prior case.  There appears to be no record of
Mr. Smocks having served in the military, and this assertion
appears to be just another in a long series of falsehoods.

Mr. Smocks -- and I'd also note that I clarified with
the presentence report writer that Mr. Smocks' last period of
supervision ended in 2019, just two years ago.  Mr. Smocks'
record is notable for his apparent inability to live a
law-abiding life.  While I believe, and I continue to believe,

that every individual is capable of change and growth, I'm not
optimistic in this case, where it appears that Mr. Smocks is
still engaging in deception.

He does not appear to have any genuine remorse for his
actions.  I listened to every word Mr. Smocks said today, and
nowhere did I hear any remorse for his actions or any fear that
he might have instilled for any role that he might have played
in the events of January 6.  No remorse.

All I hear is what you have suffered, Mr. Smocks.  The
treatment that you have suffered.  You're being singled out.
You're being persecuted.  You're a victim of racism.  You've
endured terrible conditions at the D.C. jail.  There's not a
single word of acknowledgement of the enormity and seriousness
of what you did.

With regards to the types of sentences available, the
guideline range here is 8 to 14 months.  And I will note that,
as I said earlier, there was a plausible basis for the Probation
Office to argue that a four-level enhancement was appropriate
and that the sentencing category was three instead of two.  And
had that been the case, you would have been looking at a higher
sentencing range.  As it is, the government has asked for you to
basically get a sentence of time served, as has your lawyer.

With regard to the need to avoid sentence disparity, I find
that this is a factor, although I have found in the past and I
find here that the crimes that occurred on January 6 are so

1  unusual and unprecedented that it is very difficult to find a

2  proper basis for disparity.

3       But I will note that I -- you talked about other people

4  have received sentences of incarceration.  I have imposed

5  sentences of incarceration in three misdemeanor cases where the

6  defendants did not have your kind of criminal record, and other

7  judges have given incarceration, probation, home detention.  I

8  will note here, as far as disparity goes, that I am being asked

9  to give a sentence well within the guideline range, and I intend

10  to give a sentence within the guideline range.

11       With regard to restitution, the government has not asked

12  for restitution.  You did not agree to pay restitution as part

13  of your plea agreement here, and I will not order that

14  restitution be paid.

15       The main factors driving the Court's sentencing decision

16  here are the seriousness of the offense, the need for

17  deterrence, and the need to protect the public from future

18  criminal conduct that might be committed by the defendant.

19  Although you were not present at the Capitol, Mr. Smocks, you

20  encouraged the rioters and, even after the riot was over,

21  transmitted threats to politicians and technology company

22  executives.

23       As I said before, you do not appear to have any genuine

24  remorse or even really an understanding of the seriousness of

25  your actions.  And moreover, you come into this court and

1    portray yourself as somehow a victim of racism, which I

2    completely reject.

3    　　　Notwithstanding the government's request at allocution and

4    your lawyer's request, the Court believes that a sentence at the

5    high end of the guidelines range is appropriate in this case.

6    Therefore, based on my consideration of all the § 3553 factors,

7    I'll now state the sentence to be imposed.  Please rise.

8    　　　(Defendant complies.)

9    　　　It is the judgment of the Court, that you, Mr. Smocks, are

10   hereby committed to the custody of the Bureau of Prisons for a

11   term of 14 months of incarceration, and that you are further

12   sentenced to serve supervised release for a term of three years

13   with conditions as I will set, and to pay $100 special

14   assessment to the Clerk of Court for the U.S. District Court.

15   The Court finds that you do not have the ability to pay a fine

16   and therefore waives imposition of a fine in this case.

17   　　　The special assessment is immediately payable to the Clerk

18   of the Court for the U.S. District Court of the District of

19   Columbia.  Within 30 days of any change of address, you shall

20   notify the Clerk of the Court of the change until such time as

21   the financial obligation is paid in full.

22   　　　Mr. Machado, do you have any recommendation -- given that

23   it's not going to be a particularly -- you know, Mr. Smocks has

24   already done nine months.  14 months is -- he may not even make

25   it to a Bureau of Prisons facility, but do you have a

1  recommendation or request for a recommendation for a facility?

2          MR. MACHADO:  May I have the Court's indulgence for a

3  moment?

4          THE COURT:  Yes.

5      (Counsel and Defendant conferring.)

6          MR. MACHADO:  Thank you, Your Honor.  I've spoken to

7  Mr. Smocks, and he would like to be placed, if possible, within

8  the Dallas, Texas, area.

9          THE COURT:  All right.  I will make a recommendation

10  to the Bureau of Prisons that Mr. Smocks be housed at Bureau of

11  Prisons in the Dallas, Texas, area.

12      All right.  With regard to the conditions of your

13  supervised release, while under supervision you shall abide

14  by the following mandatory conditions as well as the standard

15  conditions of supervision which are imposed to establish the

16  basic expectations for your conduct while on supervision.

17      The mandatory conditions include: You must not commit

18  another federal, state, or local crime.  You must not unlawfully

19  possess a controlled substance.  The mandatory drug testing

20  condition is suspended based on the Court's determination that

21  you pose a low risk of future substance abuse.  You must

22  cooperate in the collection of DNA as directed by the probation

23  officer.

24      You shall comply with the following special condition:

25      Computer monitoring and search.  To ensure compliance with

the computer monitoring condition, you must allow the probation officer to conduct initial and periodic unannounced searches of any computers as defined in 18 U.S.C. § 1030(c)(1) subject to computer monitoring.

These searches shall be conducted to determine whether the computer contains any prohibited data prior to installation of the monitoring software, whether the monitoring software is functioning effectively after its installation, and whether there have been attempts to circumvent the monitoring software after its installation.  You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition.

Within 45 days of release from incarceration, you will appear before the Court for -- well, no.  Sorry.  I don't need a reentry progress hearing.

The Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the -- so the only special condition is the computer monitoring search condition.

Probation Office shall release the presentence investigation report to all appropriate agencies, which includes the United States Probation Office in the approved district of residence, in order to execute the sentence of the Court. Treatment agencies shall return the presentence report to the Probation Office upon the defendant's completion or termination

1    from treatment.

2         Pursuant to 18 U.S.C. § 3742, you have a right to appeal

3    the sentence imposed by this court if the period of imprisonment

4    is longer than the statutory maximum or the sentence departs

5    upward from the applicable sentencing guidelines range.  If you

6    choose to appeal, you must file any appeal within 14 days after

7    the Court enters judgment.

8         As defined in 28 U.S.C. § 2255, you also have the right to

9    challenge your conviction entered or sentence imposed if new and

10   currently unavailable information becomes available to you or on

11   a claim that you received ineffective assistance of counsel in

12   entering a plea of guilty to the offense of conviction or in

13   connection with sentencing.  If you are unable to afford the

14   cost of an appeal, you may request permission from the Court to

15   file an appeal without cost to you.

16        Any objections not already noted to the sentence of the

17   Court, Mr. Friedman?

18             MR. FRIEDMAN:  No, Your Honor.

19             THE COURT:  Mr. Friedman, I can't remember from the

20   plea agreement; were you going to make a motion to dismiss the

21   remaining counts?

22             MR. FRIEDMAN:  Yes, Your Honor.

23             THE COURT:  All right.  Are you going to make that

24   motion now?

25             MR. FRIEDMAN:  Yes.  Count 2 of the indictment should

1    be dismissed.

2              THE COURT:  All right.  The motion will be granted.

3         Mr. Machado?  Any further objection not already stated?

4              MR. MACHADO:  No, Your Honor, although he will get

5    credit for time served.

6              THE COURT:  Yeah.  He will obviously get credit for

7    time served.  He'll get credit for whatever appropriate time

8    served is in this case.  Now, I don't have any information that

9    he was held on a detainer or serving out any other sentence.  So

10   the Bureau of Prisons should make that calculation.  Obviously,

11   if you challenge that, you can raise it.

12             MR. MACHADO:  Yes, Your Honor.  Thank you.

13             THE COURT:  All right.  Thank you.  We're adjourned.

14        (Proceedings adjourned at 3:13 p.m.)

15

16

17

18

19

20

21

22

23

24

25

\* \* \* \* \* \*

CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

*/s/ Bryan A. Wayne*
Bryan A. Wayne